FILED
2021 Mar-31  AM 10:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**EASTERN DIVISION**

| | |
|---|---|
| **ROBERT SHAWN INGRAM,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **vs.** ) | **1:17-cv-01464-LSC** |
| ) | |
| ) | |
| **CYNTHIA STEWART,**[1] ) | |
| **Warden, Holman Correctional** ) | |
| **Facility,** ) | |
| ) | |
| **Respondent.** ) | |

**MEMORANDUM OF OPINION**

This is a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed

by Petitioner Robert Shawn Ingram ("Ingram"), a death row inmate at Holman

Correctional Facility in Atmore, Alabama. Ingram challenges the validity of his 1995

conviction on one count of capital murder and sentence of death in the Circuit Court

of Talladega County, Alabama. Upon thorough consideration of the entire record

and the briefs submitted by the parties, the Court finds that Ingram's petition for

habeas relief is due to be denied.

## I.    FACTS OF THE CRIME

---

[1]    When this petition was initially filed, Cynthia Stewart was the Warden of Holman
Correctional facility. She is no longer Warden, and she was replaced by Terry Raybon. Respondent
states that Raybon has since been replaced.

The Alabama Court of Criminal Appeals ("ACCA") on direct appeal described the killing and the surrounding circumstances as follows:

> The state's evidence showed the following: On July 31, 1993, Ingram, along with Anthony Boyd, Moneek Marcell Ackles, and Dwinaune Quintay Cox, kidnapped Gregory Huguley, by force and at gunpoint, from a public street in Anniston, took him to a ballpark in a rural area of Talladega County, and, while he was pleading for his life, taped him to a bench, doused him with gasoline, set him on fire, and burned him to death. The state's evidence showed that Ingram was a principal actor in the murder, wielding the gun and using force to effect the kidnapping, pouring the gasoline on Huguley, and lighting the gasoline with a match. The evidence also shows that Huguley was abducted and killed because he failed to pay $200 for crack cocaine sold to him several days before the murder. The record further shows that after Huguley had been set on fire, the conspirators stood around for approximately 20 minutes and watched him burn to death.

*Ingram v. State*, 779 So. 2d 1225, 1238 (Ala. Crim. App. 1999) (footnotes omitted).

## II.    PROCEDURAL HISTORY

Ingram was charged with capital murder during the course of a kidnapping in the Circuit Court of Talladega County on June 28, 1994. After a jury trial, he was convicted of that one count of capital murder on May 18, 1995, and the jury then recommended a sentence of death by an 11-1 vote.  The trial court sentenced Ingram to death on June 16, 1995.[2]

---

[2]      As for Ingram's three friends, Anthony Boyd was convicted of capital murder and sentenced to death, *see Boyd v. State*, 715 So. 2d 825 (Ala. Crim. App. 1997); Moneek Marcell Ackles was convicted of capital murder and sentenced to life without the possibility of parole, *see Ackles v. State*, 689 So. 2d 1010 (Ala. Crim. App. 1996); and Dwinaune Quintay Cox pled guilty to

Through the same counsel who represented him at trial, Ingram appealed his conviction and death sentence, raising 24 issues. The ACCA affirmed his conviction and sentence. *Ingram*, 779 So. 2d at 1225. The Alabama Supreme Court also affirmed his conviction and sentence. *Ex parte Ingram*, 779 So. 2d 1283 (Ala. 2000). Ingram filed a writ of certiorari to the United States Supreme Court, but it was denied on February 26, 2001. *Ingram v. Alabama*, 531 U.S. 1193 (2001).

Represented by new counsel, on February 1, 2002, Mills timely filed a petition pursuant to Alabama Rule of Criminal Procedure 32 (hereinafter, "the Rule 32 petition") in the Talladega County Circuit Court challenging his conviction and sentence on various grounds. He requested, among other things, discovery, funds for expert and investigative expenses, and time to amend his petition. On March 18, 2002, the State filed an answer and a motion for partial summary dismissal of the Rule 32 petition. On April 18, 2002, Ingram filed an amended Rule 32 petition, raising an additional claim (hereinafter, the "first amended petition"). The State answered and filed a motion for summary dismissal of the first amended petition on July 26, 2002. On June 8, 2004, the trial court adopted verbatim a proposed order

---

murder, pursuant to a plea bargain in which he agreed to testify against the others, and was sentenced to life imprisonment. *See Ingram*, 779 So. 3d at 1238 n.6.

that had been submitted by the State on May 20, 2004, summarily dismissing the first amended petition in its entirety. (Vol. 15, Tab #R-48, C. 205.)

Ingram appealed the denial to the ACCA, which affirmed the summary denial. *Ingram v. State*, 51 So. 3d 1094 (Ala. Crim. App. 2006). Ingram filed a petition for writ of certiorari to the Alabama Supreme Court. The Alabama Supreme Court granted the writ and reversed the ACCA because the circuit court's order was not the product of the circuit court's independent judgment. *Ex parte Ingram*, 51 So. 3d 1119, 1121 (Ala. 2010). Noting that the circuit judge who ruled on Ingram's first amended petition was not the same judge who had presided over Ingram's trial, the Alabama Supreme Court determined that the circuit court's wholesale adoption of the State's proposed order constituted reversible error because the order contained erroneous statements, including statements that the circuit judge ruling on the petition had presided over Ingram's trial, which he had not; that the circuit judge had personally observed the performance of Ingram's trial counsel, which he had not; and that the circuit judge was basing his decision, in part, on events within his own personal knowledge of the trial of the case, but of which he actually had no personal knowledge. *Id.* at 1123-24. The Alabama Supreme Court held that "the nature of the errors present in the June 8 order . . . undermines any confidence that the trial court's findings of fact and conclusions of law are the product of the trial

judge's independent judgment and that the June 8 order reflects the findings and conclusions *of that judge*." 51 So. 3d at 1125. The Alabama Supreme Court thus reversed the ACCA's affirmance of the circuit court's summary dismissal of Ingram's first amended Rule 32 petition and remanded the case to the ACCA, *see id.*, which in turn reversed the circuit court's order and remanded the case to the circuit court for further proceedings, *see Ingram v. State*, 51 So. 3d 1126 (Mem.) (Ala. Crim. App. 2010).

On remand in the circuit court, there was briefing by the parties about whether Ingram should be allowed to file a second amended petition, insofar as whether that would be outside the scope of the Alabama Supreme Court's remand instructions. The circuit court ultimately refused to allow Ingram to file a second amended petition and once again summarily dismissed Ingram's first amended petition. (Vol. 22, Tab #R-72, C. 209.) Ingram filed a motion to reconsider, along with the second amended petition that he had sought to file. The motion to reconsider was denied. (Vol. 22, Tab #R-73, C. 283.)

Ingram then appealed the denial to the ACCA. On appeal, the ACCA reversed the circuit court's dismissal and remanded the case on the sole ground that the circuit court erred in denying Ingram's request to file a second amended petition. *Ingram v. State*, 103 So. 3d 86 (Ala. Crim. App. 2012).

On a second remand to the circuit court, Ingram filed a third amended petition on November 5, 2012. He also filed a motion for funds for mental health expert services. After the State answered and moved for partial dismissal, the circuit court issued an order summarily dismissing most of Ingram's claims in the third amended petition. (Vol. 26, Tab #R-90, C. 278.) On June 25, 2013, Ingram filed a fourth amended petition, which was followed by the State's answer on August 26, 2013. On October 9, 2013, the circuit court issued an order dismissing one of the claims raised in Ingram's fourth amended petition. (Vol. 27, Tab #R-93, C. 512.) Ingram filed his fifth and final amended petition on December 2, 2013. The State answered and moved for partial dismissal, and the circuit court entered an order dismissing two of the claims raised in the fifth amended petition but granting an evidentiary hearing on the five claims that survived.

Prior to the evidentiary hearing, Ingram had filed a motion for funds for mental health expert services, which was opposed by the State and denied by the circuit court. Ingram then secured as *pro bono* experts two individuals who were not mental health experts and who had never met or evaluated Ingram but whose expertise purportedly centered around neurotoxin exposure as mitigation evidence in capital cases and the relationship between exposure to lead poisoning and criminal behavior. Prior to the hearing Ingram listed these individuals as expert witnesses. In response,

the State moved to have Ingram examined by a mental health expert contracted by the State, in order to rebut any possible mental health testimony Ingram intended to offer through these experts at the hearing. The circuit court granted the State's motion. Ingram challenged the ruling, asking the ACCA for a writ of mandamus directing the circuit judge to vacate its order and to stay the evidentiary hearing. The ACCA denied the mandamus petition. (Vol. 43, Tab #R-112.) Ingram then filed an emergency petition requesting the same relief from the Alabama Supreme Court. The Alabama Supreme Court denied the petition on the morning of the hearing. (Vol. 44, Tab #R-114.)

The hearing was held on April 3-4, 2013. On the first morning of the hearing, Ingram's counsel reiterated to the circuit court that, on counsel's advice, Ingram would not cooperate with any mental health examination by an expert contracted by the State. The circuit court then ruled that Ingram would not be able to call his two experts at the hearing.

Ingram testified on his own behalf at the hearing. He also called his former trial defense counsel and several family members as witnesses. (Vol. 30, Tab #R-102, C. 1.) After the hearing, the circuit court issued a nearly 100-page order denying Ingram post-conviction relief on June 28, 2017. (Vol. 29, Tab #R-97, C. 907.)

Ingram did not timely appeal that decision. However, on August 17, 2017, he filed a petition pursuant to Ala. R. Crim. P. 32.1(f) in the circuit court requesting an out-of-time appeal due to his post-conviction counsel's failure to receive notification that the circuit court had dismissed his fifth amended petition in time to seek an appeal.

On August 29, 2017, Ingram filed the instant habeas corpus petition with this Court. (Doc. 1.) He also asked this Court to grant him a stay of these federal habeas proceedings pending exhaustion of his post-conviction claims. (Doc. 2.) In support, Ingram explained that if his request for an out-of-time appeal in the circuit court was not granted, meaning that his state post-conviction proceedings had concluded, then he would have been deemed to have had only six days remaining on his federal limitations period as of the date of the filing of the motion to stay and the federal habeas petition.[3] This Court granted that stay, requesting periodic status reports. (Doc. 8.)

On April 4, 2018, after some failed attempts, Ingram obtained permission from the circuit court to file an out-of-time appeal of the denial of his fifth amended Rule 32 petition. He did so appeal, and on September 13, 2019, the ACCA affirmed the denial of the fifth amended Rule 32 petition in a memorandum opinion.  (Vol. 41,

---

[3]   *See generally* 28 U.S.C. § 2244(d); *Rhines v. Weber*, 544 U.S. 269 (2005).

Tab #R-107). Ingram petitioned the ACCA for rehearing, which was denied. The Alabama Supreme Court denied Ingram's petition for writ of certiorari on February 21, 2020 (Vol. 42, Tab #R-110), which completed Ingram's exhaustion of his state post-conviction claims.

On March 4, 2020, this Court lifted the stay and entered a scheduling order, setting a due date for the amended petition of April 3, 2020. In March 2020, due to the COVID-19 pandemic, the Alabama Department of Corrections banned all legal visits for prisoners in the State of Alabama, and counsel for Ingram requested and was granted several extensions of time to file Ingram's amended petition and memorandum of compliance with this Court's order. (Docs. 25, 27, 29.) As of October 2020, the Alabama Department of Corrections was still not allowing in-person visits by counsel or experts. This Court asked Ingram's counsel to arrange a secure telephone call with Ingram to review the amended petition, and that call took place on October 21, 2020. This Court entered a new scheduling order for the submission of the amended petition and other briefs. (Doc. 30.) Ingram filed his amended petition on November 20, 2020 (doc. 31); Respondent filed its answer and response brief on December 21, 2020 (docs. 35, 36); and Ingram filed his reply brief on March 9, 2021. (Doc. 43.)

This is Ingram's first and only application for federal habeas corpus relief, and as it is timely filed and fully briefed, it is now ripe for review.

## III.   STANDARDS OF FEDERAL HABEAS REVIEW

This action is governed by 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011). Pursuant to § 2254(a), a federal district court is prohibited from entertaining a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court" unless the petition alleges "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In other words, this Court's review of habeas claims is limited to federal constitutional questions. Claims pertaining solely to "an alleged defect in a [state] collateral proceeding" or to a "state's interpretation of its own laws or rules" do not provide a basis for federal habeas corpus relief under § 2254. *Alston v. Dep't of Corr., Fla.*, 610 F.3d 1318, 1325-26 (11th Cir. 2010) (quotation marks and citations omitted).

### A.   Exhaustion of State Remedies and Procedural Default

Under § 2254(b) and (c), a federal court must limit its grant of habeas applications to cases where an applicant has exhausted all state remedies. *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011). This means that "'[s]tate prisoners must give

the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's last court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358-59 (11th Cir. 2003) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). Alabama's discretionary direct review procedures bring Alabama prisoner habeas petitions within the scope of the rule. *Id*. The purpose of this requirement is to ensure that state courts are afforded the first opportunity to correct federal questions affecting the validity of state court convictions. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998); *see also Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) ("Federal courts are not forums in which to relitigate state trials.") (citation omitted)).

Moreover, "to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. 'It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made.'" *Snowden*, 135 F.3d at 735 (quoting *Anderson v. Harless*, 459 U.S. 4, 5-6 (1982)).

"[A]n issue is exhausted if 'the reasonable reader would understand the claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1286 (11th

Cir. 2012) (quoting *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004)) (brackets in original omitted). If a petitioner fails to raise his federal claim to the state court at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits, i.e., "the petitioner will have procedurally defaulted on that claim." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010). Moreover, a "state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas review of that claim." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

Yet as the Eleventh Circuit has noted, a claim will only be procedurally defaulted in the following circumstance:

> [A] state court's rejection of a federal constitutional claim on procedural grounds may only preclude federal review if the state procedural ruling rests upon "adequate and independent" state grounds. *Marek v. Singletary*, 62 F.3d 1295, 1301 (11th Cir. 1995) (citation omitted).

> We have "established a three-part test to enable us to determine when a state court's procedural ruling constitutes an independent and adequate state rule of decision." *Judd*, 250 F.3d at 1313. "First, the last state court rendering a judgment in the case must clearly and expressly

state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim." *Id.* Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. *See id.* Third, the state procedural rule must be adequate, i.e., firmly established and regularly followed and not applied "in an arbitrary or unprecedented fashion." *Id.*

*Ward*, 592 F.3d at 1156–57 (footnote omitted).

There are also instances where the doctrines of procedural default and exhaustion intertwine. For instance, if a petitioner's federal claim is unexhausted—i.e., the petitioner never presented the claim to the state court—a district court will traditionally dismiss it without prejudice or stay the cause of action to allow the petitioner to first avail himself of his state remedies. *See Rose v. Lundy*, 455 U.S. 509, 519-20 (1982). But "if it is clear from state law that any future attempts at exhaustion [in state court] would be futile" under the state's own procedural rules, a court can simply find that the claim is "procedurally defaulted, even absent a state court determination to that effect." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (citation omitted).

The Court notes that Ingram asserts that he is not required to have exhausted any of his claims in the state courts before this Court may review his claims on the merits because Alabama's state post-conviction process is inadequate to protect his rights. (Doc. 31 at 24-28.) Ingram cites 28 U.S.C. § 2254(b)(1)(B)(ii), which excuses

federal habeas corpus petitioners from the exhaustion requirement where "(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant." In other words, Ingram contends that, if a state does not provide the appropriate level of process, its rulings are not entitled to any deference, and any claim may be raised in federal court without exhaustion. One of the ways in which Ingram asserts that Alabama's post-conviction process fails petitioners is that petitioners are not often granted State funding for experts to prove the factual bases of their claims. Ingram does not support this assertion with any precedential authority, however, and it is without merit.

### B.    Overcoming Procedural Default

"[A]n adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 749–50 (1991) (citations and internal quotation marks omitted).

The "cause and prejudice" exception is framed in the conjunctive, and a petitioner must prove both cause and prejudice. *Id.* at 750. To show cause, a

petitioner must prove that "some objective factor external to the defense impeded counsel's efforts" to raise the claim previously. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Examples of such objective factors include:

> . . . interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel. In addition, constitutionally ineffective assistance of counsel . . . is cause. Attorney error short of ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default.

*McCleskey v. Zant*, 499 U.S. 467, 494 (1991) (internal quotation marks, brackets, and citations omitted). As for prejudice, a habeas petitioner must show "not merely that the errors . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

Finally, a petitioner may also escape a procedural default bar if he "can demonstrate a sufficient probability that [the court's] failure to review his federal claim will result in a fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). To make such a showing, a petitioner must establish that either: (1) "a constitutional violation has probably resulted in the conviction of one who is actually innocent," *Smith v. Murray*, 477 U.S. 527, 537 (1986) (quoting *Carrier*, 477 U.S. at 496), or (2) the petitioner shows "by *clear and convincing* evidence that but for a constitutional error, no reasonable juror would have found

the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323 (1995)

(emphasis in original) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

## C.     AEDPA Review of State Court Decisions Under § 2254(d) and (e)

When a constitutional claim upon which a petitioner seeks relief under § 2254

is not procedurally defaulted but has instead been adjudicated on the merits in state

courts, this Court is still restricted in its ability to grant relief on those claims by §

2254(d). The AEDPA "imposes a highly deferential standard for evaluating state-

court rulings" and "demands that state-court decisions be given the benefit of the

doubt." *Guzman*, 663 F.3d at 1345 (internal quotation marks and citation omitted).

To grant habeas relief on a claim, this Court must not only find that the constitutional

claims are meritorious, but also that the state court's resolution of those claims:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *see also Boyd v. Allen*, 592 F.3d 1274, 1292 (11th Cir.

2010) (quoting § 2254(d)). The burden of showing that an issue falls within §

2254(d)(1) or (d)(2) is upon the petitioner. *See Woodford v. Visciotti*, 537 U.S. 19, 25

(2002). Section 2254(d)(1)'s "contrary to" and "unreasonable application of"

clauses have independent meanings. *See Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) ("[T]he 'contrary to' and 'unreasonable application' clauses are interpreted as independent statutory modes of analysis.") (citation omitted). A state court's decision is contrary to "clearly established precedents [of the Supreme Court of the United States] if it applies a rule that contradicts the governing law set forth in [the Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of th[e] Court but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005) (citation omitted). On the other hand, to determine whether a state court's decision is an "unreasonable application" of clearly established federal law, the Supreme Court has stated:

> The pivotal question is whether the state court's application of the [relevant constitutional] standard was unreasonable . . . For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the [relevant constitutional] standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. And as the [Supreme Court] has explained, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citation and quotation marks omitted) (emphasis in original); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The

question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Guzman*, 663 F.3d at 1346 ("Ultimately, before a federal court may grant habeas relief under § 2254(d), 'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'") (quoting *Harrington*, 562 U.S. at 103). As the Supreme Court has stated, "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102.

Additionally, a state court's factual determination is entitled to a presumption of correctness under § 2254(e)(1). And commensurate with the deference accorded to a state court's factual findings, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward,* 592 F.3d at 1155-56 (alterations in original) (quoting § 2254(e)(1)).

The Court notes that Ingram contends that this Court should not apply 28 U.S.C. § 2254(d) to the claims raised in his amended habeas petition because the statute is unconstitutional. (Doc. 31 at 15-21.) He asserts that the statute is

unconstitutional because it requires this Court to abdicate its authority to apply the Constitution and instead defers to a state court's interpretation of federal law in violation of Article III and Article VI of the United States Constitution.

Ingram's argument is without merit. Significantly, Ingram does not cite any binding caselaw or other authorities to support his contention. Moreover, federal courts repeatedly have rejected the claim that § 2254(d) is unconstitutional. *See, e.g.*, *Cobb v. Thaler*, 682 F.3d 364, 377 (5th Cir. 2012) (rejecting "argument that § 2254(d)(1) is unconstitutional under Article III"); *Evans v. Thompson*, 518 F.3d 1, 4-12 (1st Cir. 2008) (rejecting claim that "§ 2254(d)(1) violates Article III, the separation of powers, and the Supremacy Clause"); *Crater v. Galaza*, 491 F.3d 1119, 1125-26 (9th Cir. 2007) (rejecting claim that § 2254(d)(1) "violates the Suspension Clause and interferes with the independence of federal courts under Article III"); *Green v. French*, 143 F.3d 865, 874-75 (4th Cir. 1998), *abrogated on other grounds by Williams v. Taylor*, 529 U.S. 362 (2000); *Lindh v. Murphy*, 96 F.3d 856, 871-74 (7th Cir. 1996) (en banc), *rev'd on other grounds*, 521 U.S. 320 (1997).

### D.    The Burden of Proof and Heightened Pleading Requirements for Habeas Petitions

Additionally, because habeas corpus review is limited to review of errors of constitutional dimension, a habeas corpus petition "must meet [the] heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2(c)." *McFarland v. Scott*, 512 U.S.

849, 856 (1994) (citation omitted). "[T]he petition must 'specify all the grounds for relief available to the petitioner' and 'state the facts supporting each ground.'" *Mayle v. Felix*, 545 U.S. 644, 655 (2005) (quoting Rule 2(c) of the Rules Governing § 2254 Cases in the U.S. District Courts). The burden of proof is on the habeas petitioner "to establish his right to habeas relief and he must prove all facts necessary to show a constitutional violation." *Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008) (citation omitted); *see also Smith v. Wainwright*, 777 F.2d 609, 616 (11th Cir. 1985) (holding that a general allegation of ineffective assistance of counsel is insufficient; a petition must allege specific errors in counsel's performance and facts showing prejudice).

### E.    The General Standard for Ineffective Assistance of Counsel Claims

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established the following two-pronged standard for judging, under the Sixth Amendment, the effectiveness of attorneys who represent criminal defendants at trial or on direct appeal:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as

to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id.* at 687.

Because *Strickland*'s preceding two-part test is clearly framed in the conjunctive, a petitioner bears the burden of proving both "deficient performance" and "prejudice" by "a preponderance of competent evidence." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc); *see also Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, [ ] or vice versa.").

In order to establish deficient performance, a habeas petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. That reasonableness is judged against "prevailing professional norms." *Id*. Moreover, under *Strickland*, lower federal courts must be "highly deferential" in their scrutiny of counsel's performance. *Id.* at 689. As the *Strickland* Court outlined:

Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for

a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id.* (citations and quotation marks omitted).

Simply put, a habeas petitioner "must establish that no competent counsel would have taken the action that his counsel did take" to overcome the presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Chandler*, 218 F.3d at 1315. The reasonableness of counsel's performance is judged from the perspective of the attorney, at the time of the alleged error, and in light of all the circumstances. *See, e.g.*, *Newland v. Hall*, 527 F.3d 1162, 1184 (11th Cir. 2008) ("We review counsel's performance 'from counsel's perspective at the time,' to avoid 'the distorting effects of hindsight.'") (quoting *Strickland*, 466 U.S. at 689).

To satisfy the prejudice prong, a habeas petition "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Stated differently, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (citations and quotation marks omitted). Further, the fact that counsel's "errors had some conceivable effect on the outcome of the proceeding" is insufficient to show prejudice. *Strickland*, 466 U.S. at 693. Therefore, "when a petitioner challenges a death sentence, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Strickland*, 466 U.S. at 695).

Because *Strickland* and § 2254(d) both mandate standards that are "'highly deferential'", "when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (citations omitted). The inquiry is not then "whether counsel's actions were reasonable," but is instead "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* The court must determine "whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance

fell below *Strickland*'s standard." *Id*. at 101. This "[d]ouble deference is doubly

difficult for a petitioner to overcome, and it will be a rare case in which an ineffective

assistance of counsel claim that was denied on the merits in state court is found to

merit relief in a federal habeas proceeding." *Evans v. Sec'y, Fla. Dep't of Corr.*, 699

F.3d 1249, 1268 (11th Cir. 2012).

Finally, "[s]tate court findings of historical facts made in the course of

evaluating an ineffectiveness claim are subject to a presumption of correctness under

28 U.S.C. § 2254(d)." *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001).

## IV.   DISCUSSION OF INGRAM'S CLAIMS

**A.   Ingram's claim that he was denied his right to effective assistance of counsel because his trial defense counsel did not properly advise him of the risks of refusing to comply with the terms of his plea agreement or take steps to ensure that he would comply with the terms of his plea agreement**

On September 15, 1993, Ingram signed a written plea agreement with the

State, which detailed that Ingram could enter a guilty plea to the lesser-included

offense of murder, and the State would recommend that he receive a sentence of life

imprisonment with the possibility of parole. (Vol. 1, Tab #R-1, C. 33-35.) In return,

Ingram was required to cooperate with the State's investigation and testify against

his co-defendants. (*Id*. at 34-35.) If Ingram failed to perform either condition, then

the agreement would be "null and void." (*Id.* at 35.)

Between the time the agreement was made and Anthony Boyd's ("Boyd's") trial, Ingram was incarcerated with his three co-defendants. Co-defendant Moneek Marcell Ackles ("Ackles") (who had not given a statement to law enforcement), urged the other three that, if they all refused to testify, the State could not convict any of them. (Vol. 31, Tab #R-102, at 88-90.) As described by Ingram later during his post-conviction proceedings in the state court, Ackles' advice was simple: "nobody talks, everybody walks." (Vol. 41, Tab #R-107, at 10.)

Boyd's trial was before Ingram's. When it came time for Ingram to fulfill his end of the bargain and testify against Boyd at Boyd's trial, Ingram decided to exercise his right to remain silent. The trial court gave Ingram the opportunity to meet with his defense attorneys to discuss his decision. He and his attorneys then appeared before the trial court, which conducted a thorough colloquy with Ingram to determine whether he understood what he was doing. (Vol. 1, Tab #R-2, C. 61–69.) During that colloquy, the State noted that Ingram had given a statement admitting his involvement in the crime, that it was viewing his failure to testify against Boyd as a breach of the plea agreement, that it would try Ingram for capital murder, and that it intended to use Ingram's statement against him at trial. (*Id*. at 61-66.) The trial court asked Ingram whether he understood that "regular" murder carried with it a sentence of life imprisonment with the possibility of parole, while capital murder

carried either a sentence of life in prison without the possibility of parole or death. (*Id.* at 66-67.) Ingram repeatedly expressed that he understood and maintained that he wanted to exercise his right to remain silent and not testify against Boyd. (*Id.* at 66.) After the trial court determined that Ingram understood what he was doing and what he was giving up, the State sought permission to void the plea agreement and proceed against Ingram for capital murder, which the trial court granted. (*Id.* at 36-37.)

Based on these facts, Ingram's first claim is that his trial defense counsel were constitutionally ineffective in failing to persuade him to follow through with his initial plea agreement and testify against Boyd at Boyd's trial. Ingram faults his counsel for not impressing on him the fact that Boyd would likely be found guilty regardless if Ingram testified against him; that Ingram would also surely be found guilty based on his previous statements to the police; and that due to the nature of this crime, it was likely that if convicted, Ingram would get the death penalty. Ingram further argues that his trial counsel should have involved his family in an attempt to persuade him to follow through with his plea agreement. Ingram claims that his counsel's deficient performance prejudiced him, given the fact that Ingram has been on death row since his conviction, but the other co-defendant who did follow through with his plea agreement and testify against Boyd at Boyd's trial, Dwinaune Quintay

Cox ("Cox"), received a sentence of life imprisonment with the possibility of parole and indeed is no longer in prison.

Ingram raised this ineffective assistance of counsel claim for the first time in his Rule 32 petition,[4] and on April 3-4, 2013, the circuit court held an evidentiary hearing on this claim. At the hearing, one of Ingram's trial defense lawyers, Jeb Fannin, who was by that point a Talladega County District Judge, testified. He stated that leading up to Boyd's trial, he and his co-counsel, Mark Nelson, had hoped that Ingram would uphold his agreement with the State, and that they had had conversations with Ingram about testifying. (Vol. 31, tab #R-102, at 45, 49.) Although Fannin could not specifically detail those conversations, he said that he "would have made [Ingram] aware of the evidence and his chances so to speak." (*Id.* at 49.) Fannin further testified that they were not aware that Ingram was not going to honor his agreement until Ingram got on the stand at Boyd's trial and announced that he did not want to testify. (*Id.* at 50–51.) Fannin said that at that point, he and Nelson met with Ingram, explained to him the consequences of his decision, and tried to

---

[4]     Alabama Rule of Criminal Procedure 32.2(d) mandates that all claims of ineffective assistance of counsel "must be raised as soon as practicable, either at trial, on direct appeal, or in the first Rule 32 petition, whichever is applicable." In his direct appeal, Ingram was represented by the same lawyers who represented him at trial. Thus, he presented his ineffective assistance of trial counsel claims at the first opportunity where he was not represented by those lawyers. The State does not argue that Ingram should have raised his ineffective assistance of trial counsel claims earlier.

influence him to change his mind. (*Id*. at 52.) Fannin explained that while they urged him to testify, Ingram was "adamant in his decision," and they could not "twist his arm and make him testify." (*Id*. at 79).

At the hearing, Ingram explained that he chose not to testify against Boyd for two reasons. First, he explained that, in pre-trial detention, Ackles "came up with the idea, if everybody be quiet, we all go home." (*Id*. at 90.) Ingram added that when he told his defense counsel that he was not going to testify against Boyd, they "didn't pressure me to testify or try to get any additional information from me or anything, why or anything. They just left it at that." (*Id*. at 91.) Ingram admitted that his defense counsel told him that if he did not "take the deal" and testify against Boyd, one of the other co-defendants would. (*Id*. at 101.) But Ingram said that he did not listen to his counsel's advice about one of his co-defendants taking the deal because he thought they were "bluffing." (*Id*. at 91.) Second, Ingram said that he chose not to testify because he did not want to be labeled a "snitch" in prison. (*Id*. at 90.) According to Ingram, "you don't last in the penitentiary when you get a label like that," and he "didn't never want that label carried on [him] in the penitentiary." (*Id*.)

Ingram claimed at the hearing that had his trial counsel sought out his sister or aunt to talk to him that day at Boyd's trial, then he would have listened to them

and honored the plea agreement. (*Id.* at 96-97.) Ingram called his brother, Kelvin

Ingram; sister, Carla Ingram; and aunt, Joyce Elston, to testify at the hearing, and

each stated that they would have helped to persuade Ingram to fulfill his obligation

under the plea agreement to hopefully spare his life. (Vol. 32, Tab #R-102, 172; 182;

194.) However, Fannin disagreed with Ingram's claim that he would have changed

his mind if permitted to speak with his family members, saying that if he thought that

anyone could have persuaded Ingram otherwise, then he would have sought them

out. (Vol. 31, Tab #R-102, at 79.)

The circuit court denied Ingram's claim. (Vol. 29, Tab #R-97, C. 907 at 946-

56.) On appeal, the ACCA affirmed, rejecting the claim on the merits. (Vol. 29, Tab

#R-97 at 12-13). The ACCA's thorough discussion of the claim is repeated here:

> In Ground I of Ingram's Fifth Amended Petition, Ingram
> asserted that trial counsel were ineffective during the plea negotiation
> phase of their representation. On September 15, 1993, Ingram entered
> into a plea agreement with the State; in exchange for his cooperation
> with the investigation and testifying against his co-defendants, the State
> agreed to offer him a guilty plea to murder with a recommended
> sentence of life in prison. As part of that cooperation, Ingram
> acknowledged his role in Huguley's kidnapping and murder. Ingram,
> though, failed to honor the agreement by refusing to testify at the trial
> of his co-defendant Boyd. Ingram pleaded that he declined to testify
> primarily because Ackles had told him "that if they all refused to testify,
> the State could not convict any of them, i.e., 'nobody talks, everybody
> walks.'" On March 31, 1995, the State moved to void Ingram's plea
> agreement. The State's motion was granted and Ingram subsequently
> stood trial for and was convicted of capital murder.

Ingram pleaded in his petition that, given the overwhelming evidence of his guilt, trial counsel were ineffective for failing to do more to persuade him to honor his plea agreement. Specifically, Ingram asserted that trial counsel failed to discuss with him the inevitability of his conviction, failed to arrange for his trusted family members to meet with him so that they could convince him to honor the plea agreement, and failed to ask the trial court for more time to persuade Ingram to honor the plea agreement. Ingram asserted that these failures were unreasonable under the circumstances.

At the evidentiary hearing, Judge Fannin testified that he had been hopeful Ingram would honor his plea agreement and that he did not learn of Ingram's intent to refuse to testify until Boyd's trial. Upon Ingram's announcing his intent, Judge Fannin and Nelson met privately with Ingram. Although Judge Fannin could not remember specifically, he stated that he would have reviewed with Ingram the possible outcomes of a trial. Judge Fannin testified that he disagreed with Ingram's plans and urged him to honor his plea agreement. Yet, "[Ingram] was the defendant, and he's so adamant in his decision, we just can't twist his arm and make him testify." (R. 79.) Judge Fannin could not recall whether he had considered involving one of Ingram's family members in the attempt to get Ingram to honor his plea agreement.

Ingram identified two reasons for his decision not to testify against Boyd. First, Ingram stated that Ackles proposed to his co-defendants that, "if everybody be quiet, we all go home." (R. 90.) Second, Ingram explained that he did not "want to get that label of snitch. You know, you don't last in the penitentiary when you get a label like that. I didn't never want that label carried on me in the penitentiary." (R. 90.) According to Ingram, he informed his trial counsel prior to Boyd's trial that he did not intend to testify and they did not pressure him to change his mind. Ingram added that trial counsel never explained to him the strength of the evidence against him or the likely result of a trial. Ingram testified that if trial counsel had explained to him that his conviction for capital murder as well as Boyd's were certain, he would have honored the plea agreement. Ingram also stated trial counsel did not engage any of his family members to speak

with him, but that he would have followed the advice of his sister Carla Ingram or his aunt Joyce Elston. Both Carla and Elston testified that, if they had been contacted, they would have been willing to aid trial counsel in their attempt to convince Ingram to honor his plea agreement.

In denying this claim, (C. 948-56), the circuit court reviewed the colloquy the trial court had conducted with Ingram about the ramifications of his decision and credited the testimony of Judge Fannin with respect to trial counsel's efforts to coax Ingram into honoring the plea agreement. The circuit court found trial counsel's actions to be reasonable. With respect to Ingram's claim regarding his family members, the circuit court considered opinions regarding their ability to influence Ingram as speculative, and found that Ingram had failed to offer any evidence that the family members would have been available to meet with Ingram at the time trial counsel were efforting [sic] to change Ingram's mind. Relatedly, the circuit court found that there was no evidence offered that the trial court would have waited on Ingram's family members to arrive at the courthouse on the day of Boyd's trial to speak with Ingram, and that Ingram failed to ask Judge Fannin why he did not seek a continuance from the trial court for more time to speak with Ingram; thus, Judge Fannin's reasoning was entitled to a presumption of effectiveness.

On appeal, Ingram raises a number of challenges to the circuit court's findings on this issue. Specifically, he asserts that the circuit court erred in finding trial counsel's actions reasonable, erred in finding that he had failed to prove that his trial counsel could have and should have arranged for him to speak with his sister or aunt, erred in finding that he had failed to prove that his trial counsel should have sought more time to speak with him about honoring the plea agreement, and erred in finding that he had failed to prove prejudice.

Wading through all of Ingram's specific claims on this issue is unnecessary, however. The following finding is fatal to Ingram's claim:

"Although Ingram testified at the evidentiary hearing that, had his counsel done something more -- for example, bring in

> members of his family to persuade him to honor the agreement -
> - he would have honored the agreement, <u>this Court is not
> convinced that there was anything his trial counsel could have
> done to persuade him to change his mind</u>."

(C. 952-53; emphasis added.) In other words, the circuit court found that Ingram failed to prove that any of the actions he asserted trial counsel should have undertaken would have made any difference in the outcome. Thus, Ingram failed to prove that he was prejudiced by trial counsel's alleged ineffectiveness. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. 697. The circuit court, as the finder of fact, was free to reject Ingram's self-serving testimony on this point as well as the testimony of Carla and Elston. After all, if Ingram had honored his plea agreement, he likely faced a sentence of life in prison. Yet, Ingram testified that he did not honor his plea agreement, in part, because he did not "want to get that label of snitch. You know, you don't last in the penitentiary when you get a label like that." (R. 90.) Because serving time in prison was inevitable and Ingram "never" wanted to be known as a "snitch" in prison, it was reasonable for the circuit court to conclude that Ingram would not have honored his plea agreement regardless of trial counsel's actions.

> The circuit court's findings of fact are entitled to great deference and are supported by the record. *Brooks* [*v. State*], 929 So. 2d [491, ] 495-96 [Ala. Crim. App. 2005] (citations and quotations omitted). Because Ingram failed to prove that he was prejudiced by trial counsel's alleged ineffectiveness, this issue does not entitle him to any relief. (emphasis in original.)

(Vol. 41, Tab #R-107, at 47.)

Because the state courts[5] addressed Ingram's claim on the merits, Ingram must demonstrate not only that the claim is meritorious but also that the ACCA's rejection of the claim was either an unreasonable determination of the facts in light of the evidence presented to the ACCA or was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. *See* 28 U.S.C. § 2254(d)(1)-(2); *Boyd*, 592 F.3d at 1292.

Ingram asserts that the ACCA made an unreasonable determination of the facts when it ruled that Ingram could not demonstrate *Strickland* prejudice because nothing his counsel could have done would have made Ingram change his mind about testifying, since Ingram was concerned about being labeled a "snitch" in prison. Ingram argues that his trial counsel should have impressed upon him that testifying against Boyd would never erase the fact that Ingram had already cooperated with the police once, when he entered into his initial plea agreement and acknowledged his role in the murders, so he would be labeled a "snitch" in prison anyway. (*See* Doc. 43 at 2-3 ("Counsel should have advised Mr. Ingram that he could have been labeled as a 'snitch' whether he testified or not, and all he would end up doing in not testifying against Mr. Boyd would be to be labelled a snitch without benefit.").)

---

[5]     Ingram exhausted this claim in the state courts. He raised this claim in his petition for certiorari to the Alabama Supreme Court (Vol. 42, Tab #R-109, at 51-67), but the Court denied certiorari. (*Ex parte Ingram*, Vol. 42, Tab #R-110.)

Ingram contends that it was an unreasonable determination of the facts for the circuit court, and in turn the ACCA, to not have realized this alleged failing of his defense attorneys and thus found that, absent his counsel's deficient performance in failing to sufficiently persuade him, there was a reasonable probability that Ingram would have chosen to testify against Boyd and pled guilty to life imprisonment with the possibility of parole.

This line of argument fails for several reasons. First, it is based upon the pure speculation that, had his counsel more persuasively warned him that he would already be labeled a "snitch" in prison—as he claims in hindsight they should have done—Ingram would have heeded their advice. There is no way to confirm this. To the contrary, Ingram, and his co-defendants, may have viewed those plea agreements as not evidencing as much "disloyalty" as actually testifying against one another at each other's trials. The Court cannot speculate on such matters. Second, to succeed on his ineffective assistance of counsel claim, Ingram had to do more than point out advice that his counsel could have given him. He had to demonstrate that no reasonable attorney would have failed to give him that advice. The state courts were entirely reasonable in finding that, because Ingram testified that he "never" wanted to be labeled a "snitch" in prison, nothing his counsel could have done would have changed his mind.

Ingram also argues that the state courts engaged in an unreasonable determination of the facts when they determined that 1) testimony that Ingrams' family members could have influenced his decision was speculative; 2) Ingram failed to offer evidence that his family members would have been available to meet him at the time his trial counsel were trying to change his mind at Boyd's trial; 3) Ingram failed to offer evidence that the trial court would have waited on Ingram's family members to arrive at the courthouse on the day of Boyd's trial to speak with Ingram; and 4) Ingram failed to ask his counsel at the hearing why they did not seek a continuance from the trial court for more time to speak with Ingram. Ingram appears to argue that the state courts should have also considered the fact that his co-conspirator Cox "had the same fears that Mr. Ingram did, and took the same action as Mr. Ingram, yet his relatives were able to persuade him and the prosecutor to reinstate his guilty plea." (Doc. 43 at 4). Ingram appears to contend that this additional information about Cox should have led the state courts to credit Ingram's testimony that, had he been able to speak with his family members, he would have changed his mind, and thus granted him relief on this claim.

There are several problems with this argument. First, Ingram does not plead that the circuit court was even aware, at the time of Ingram's evidentiary hearing,

that Cox changed his mind about testifying as a result of his family's persuasion.[6] Second, the ACCA did not rest its decision on whether Ingram's counsel exhibited deficient performance. Rather, it found that regardless of Ingram's counsel's performance, Ingram had failed to demonstrate *Strickland* prejudice because, due to his adamant assertion that he did not want to be labeled a "snitch" in prison, he could not establish that there was anything his counsel could have done to get him to testify against Boyd. Accordingly, the ACCA's decision would have been the same, had it also considered Cox's situation as a factor in whether Ingram's counsel's performance was deficient.

The Court also notes that Ingram does not argue that the state courts' rejections of this claim were contrary to or an unreasonable application of Supreme Court precedent under § 2254(d)(2), and in any event, the cases and other authorities that Ingram cites in this section of his briefs do not entitle him to relief. Ingram cites *Missouri v. Frye*, 566 U.S. 134 (2012), for the tenet that a criminal defendant is entitled to constitutionally effective counsel during the guilty plea process. (Doc. 31 at 40 & n.150). He also cites *Lafler v. Cooper*, 566 U.S. 156 (2012), for the rule that a defendant may show deficient performance when counsel fails to

---

[6]    In stating that Cox's relatives were able to change his mind and get his guilty plea reinstated, Ingram cites to the ACCA's opinion on direct appeal in his case. (*See* Doc. 43 at 4 n.9.) However, the cited section of the ACCA's opinion, *Ingram*, 779 So. 2d at 1238 n.7, says nothing about the circumstances under which Cox decided to change his mind and plead guilty.

properly advise a defendant concerning a plea offer. (Doc. 31 at 40 & n.151). Finally, he cites the American Bar Association ("ABA") Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, specifically the commentary to Guideline 10.9.2, which recognizes the need for "the combined and sustained efforts of the entire defense team to dissuade the client from making a self-destructive decision[,]" including the recommendation that counsel may "call on family, friends, clergy, and others to provide information that assists the client in reaching an appropriate conclusion." (Doc. 31 at 40-41.) Ingram relies on these authorities for broad propositions but provides no explanation as to how they advance his position or how the ACCA's decision falls within § 2254(d)(2)'s "contrary to" or "unreasonable application" clauses. Moreover, *Frye* and *Lafler* are distinguishable from Ingram's case. In *Frye*, the defendant's counsel was found to be constitutionally ineffective because he failed to inform the defendant of the prosecution's plea offer and, after the plea offer lapsed, the defendant plead guilty but on more severe terms. 566 U.S. at 149-50. In *Lafler*, the defendant's attorney reported the offer to his client but he, on advice of counsel, rejected the deal. Those facts don't exist in the case. To the contrary, against counsel's advice, Ingram breached the plea agreement that he had negotiated with the State and refused to testify against Boyd.

In sum, because the state courts considered this ineffective assistance of counsel claim on the merits, and Ingram has not established that the state courts' determination of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or that the state courts' determination of this issue "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings," 28 U.S.C. § 2254(d)(1)-(d)(2), federal habeas relief is foreclosed on this claim.

**B.** **Ingram's claim that the Alabama courts erred when they held that Ingram failed to establish a prima facie case of racial discrimination under *Batson v. Kentucky*, 476 U.S. 79 (1986)**

Ingram's second claim in this proceeding is that the Alabama state courts' holdings that he did not establish a prima facie case of racial discrimination in jury selection pursuant to *Batson v. Kentucky* were contrary to or unreasonable applications of clearly established Federal law.

Ingram, who is black, presented a *Batson* challenge during jury selection. (Vol. 3, Tab #R-8, TR. at 282-83.) In support, his counsel pointed out that the State used its peremptory strikes to remove seven out of the 16 black members of the jury venire, or 43.7% of the available black jurors, and he asked that the State give its reasons for those strikes. (*Id.* at 282.) The State responded that Ingram had failed to make out a

prima facie case of racial discrimination under *Batson*, so it was not required to offer the court its race-neutral reasons for its strikes. (*Id.* at 283.) The trial court agreed with the State, denied Ingram's *Batson* challenge, but stated, "If it becomes necessary, I'm sure we will find out later." (*Id.*)

On direct appeal, Ingram argued that the trial court erred in overruling his *Batson* claim, adding for the first time in support of the claim that the Talladega County District Attorney who prosecuted his case, Robert Rumsey, had a practice of racial discrimination in jury selection. In support of that allegation, he cited *Walker v. State*, 611 So. 2d 1133 (Ala. Crim. App. 1992), a capital murder-for-hire case from several years prior, in which the ACCA had held that Rumsey did not give sufficient race-neutral reasons for striking 11 of 15 black jurors and thus remanded the case to the trial court for a retrial. *Id.* at 1143. Ingram further pointed out to the ACCA that his trial judge, Judge Jerry Fielding, also presided over the *Walker* trial, which, he argued, should result in a remand of his case for the trial court to hold a *Batson* hearing during which the State should give legitimate, race-neutral reasons for striking seven black veniremembers.

The ACCA rejected Ingram's *Batson* claim on direct appeal, holding as follows:

> Ingram contends that the trial court erred in overruling his motion made pursuant to *Batson v. Kentucky*, 476 U.S. 79, 106 S .Ct.

1712, 90 L. Ed. 2d 69 (1986), in which he claimed that the state exercised certain peremptory jury strikes in a racially discriminatory manner. He asks that his case be remanded to the trial court for a *Batson* hearing. In overruling the motion, the trial court found that Ingram had failed to establish a prima facie case of racial discrimination. In *Batson*, the United States Supreme Court held that black prospective jurors could not be struck from a black defendant's jury solely because of their race. Ingram is black.

The state has the burden of articulating nondiscriminatory reasons for challenged strikes only after the defendant meets his burden of establishing a prima facie case of discrimination. *Batson*, 476 U.S. at 97, 106 S. Ct. 1712. And, until that burden is met, the state is under no obligation to offer explanations for its peremptory strikes. *Davis v. State*, 718 So. 2d 1148 (Ala. Crim. App. 1995), *aff'd*, 718 So. 2d 1166 (Ala. 1998), *cert. denied*, 525 U.S. 1179, 119 S. Ct. 1117, 143 L. Ed. 2d 112 (1999). *Edwards v. State*, 628 So. 2d 1021 (Ala. Crim. App. 1993); *Jackson v. State*, 594 So. 2d 1289 (Ala. Crim. App. 1991). In determining whether a prima facie case of discrimination has been established, the trial court is to consider all relevant circumstances that could lead to an inference of discrimination. Its determination on whether a prima facie case of discrimination has been established is to be accorded great deference on appeal. *Ex parte Branch*, 526 So. 2d 609 (Ala. 1987); *Boyd v. State*, 715 So. 2d 825 (Ala. Crim. App. 1997), *aff'd*, 715 So. 2d 852 (Ala. 1998). Its finding that a defendant did not present a prima facie case of discrimination under *Batson* is reviewed under a "clearly erroneous" standard. *Wilson v. State*, 690 So. 2d 449 (Ala. Crim. App. 1995), *aff'd. in part, quashed in part*, 690 So. 2d 477 (Ala. 1997).

In the instant case, the record shows that of the 16 blacks on the 46–member venire from which the jury was struck, the state struck 7 blacks. Each side had 16 strikes. Seven blacks served on the jury that tried the case. Ingram contended that the prosecution's striking of 7 out of 16 blacks on the venire constituted a prima facie *Batson* violation and showed systematic discrimination by the state in the selection of the jury. Ingram relied only on the bare numbers or statistics to support his *Batson* motion; he offered no additional supporting evidence. The

numbers alone, in this case, will not support a reasonable inference of racial discrimination.

All relevant evidence may be examined by the trial court, including the numbers involved, to determine whether an inference of discrimination has been raised. However, "[w]hen considered alone, evidence of the prosecution's use of a large number of its peremptory strikes to exclude black jurors would allow, but would not compel, a finding of prima facie discrimination." *Mines v. State*, 671 So. 2d 121, 123 (Ala. Crim. App. 1995); *Davis v. State. See also Ex parte Thomas*, 659 So. 2d 3 (Ala. 1994). Even if the prosecution uses all its peremptory strikes to exclude black veniremembers, a trial court is not required to find that a prima facie case of discrimination exists if other relevant evidence proves the contrary. *Mines v. State*.

In the instant case, Ingram obviously failed to meet his burden; thus, the trial court's ruling that no prima facie case had been established was not clearly erroneous.

Ingram asserts for the first time on appeal, as evidence for this court's consideration in deciding whether a prima facie case had been established, that the Talladega County District Attorney's Office has a history of racial discrimination in jury selection. He cites only *Walker v. State*, 611 So. 2d 1133 (Ala. Crim. App. 1992), to support this assertion. His reliance on *Walker v. State* is misplaced. That case does not support his contention. Furthermore, we are not aware of any information that the district attorney of Talladega County or members of his staff had or has a history of racial discrimination in jury selection. We find no merit in this assertion.

*Ingram*, 779 So. 2d at 1252-53 (footnote omitted).

Pursuant to 28 U.S.C. § 2254(d)(1)-(2), Ingram's task is to establish not only that his *Batson* claim is meritorious but also that the ACCA's rejection of the claim[7] was either an unreasonable determination of the facts in light of the evidence presented in the state court proceeding or was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. Ingram invokes only § 2254(d)(2), arguing that the ACCA's decision was contrary to or an unreasonable application of *Batson* and *Flowers v. Mississippi*, 139 S. Ct. 2228 (2019).

In *Batson*, the Supreme Court held that the Equal Protection Clause prohibits prosecutors from striking potential jurors "solely on account of their race." 476 U.S. at 89. To assist district courts in addressing *Batson* challenges, the Supreme Court outlined a three-step inquiry that courts must use to determine whether peremptory strikes have been used in a discriminatory manner. First, the party challenging the strike as discriminatory must set forth a prima facie case of discrimination. *Cent. Ala. Fair Hous. Ctr., Inc. v. Lowder Realty Co., Inc.*, 236 F.3d 629, 636 (11th Cir. 2000) (citing *Batson*, 476 U.S. at 96). "'[I]n making out a prima facie case, 'the defendant

---

[7]     Ingram exhausted this claim in the state courts. He included this claim in his petition for certiorari to the Alabama Supreme Court, but the Court affirmed the ACCA without specific discussion of this claim. *See Ex parte Ingram*, 779 So. 2d at 1285. Under the look-through presumption, a "federal [habeas] court should 'look through' [an] unexplained decision to the last related state-court decision that does provide a relevant rationale . . . [and] then presume that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, ___ U.S. ___, 138 S. Ct. 1188, 1192 (2018). The Court thus looks to the ACCA's analysis in conducting the § 2254(d) inquiry.

must point to more than the bare fact of the removal of certain venire persons and the absence of an obvious valid reason for the removal.'" *Id.* at 637 (quoting *United States v. Allison*, 908 F.2d 1531, 1538 (11th Cir. 1990)). Second, if the court agrees that a prima facie case exists, the striking party must articulate a non-discriminatory (i.e., race-neutral) explanation for its strike. *Id.* at 636. "The reason given need not be a good reason; it can be irrational, silly, implausible, or superstitious, as long as it is facially race-neutral." *United States v. Lovett*, 662 F. App'x 838, 844 (11th Cir. 2016) (citing *United States v. Hill*, 643 F.3d 807, 837 (11th Cir. 2011)). Finally, if the striking party gives a race-neutral rationale, the court must evaluate the persuasiveness of the proffered reason and determine whether the objecting party has carried its burden of proving purposeful discrimination. *See id.* (citing *Hill*, 643 F.3d at 837).

In this federal habeas proceeding, Ingram continues to rely on the percentage of black veniremembers that the State struck to meet his burden of raising the required inference of discrimination. Yet, it is well-settled that numbers alone are insufficient to establish a prima facie case of racial discrimination in jury selection. *See, e.g., United States v. Hill*, 643 F.3d 807, 838-40 (11th Cir. 2011) (the prima facie case determination is not to be based on numbers but is to be made in light of the totality of the circumstances (citing *Johnson v. California*, 545 U.S. 162, 168 (2005)),

cert. denied, 566 U.S. 970 (2012). "[A] defendant satisfies the requirements of *Batson*'s first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Johnson*, 545 U.S. at 170. Among the factors the Eleventh Circuit has instructed reviewing courts to consider in determining whether a prima facie *Batson* claim has been established based on statistical evidence alone are (1) whether members of the relevant racial or ethnic group served unchallenged on the jury, (2) whether the striker struck all of the relevant racial or ethnic group from the venire, or at least as many as the striker had strikes, (3) whether there is a substantial disparity between the percentage of jurors of a particular race or ethnicity struck and the percentage of their representation on the venire, and (4) whether there is a substantial disparity between the percentage of jurors of one race or ethnicity struck and the percentage of their representation on the jury. *United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1044-47 (11th Cir. 2005), cert. denied, 549 U.S. 952 (2006).

In rejecting this argument in support of Ingram's claim, the ACCA did not reach a conclusion contrary to *Batson*; nor was its decision an unreasonable application of that case or the cases that have applied it. As the ACCA noted, there were 16 black individuals on the 46–member venire from which the jury was struck. Each side had 16 peremptory strikes. The State used seven of its 16 peremptory

strikes[8] to strike black individuals. Seven black individuals served on the jury that tried the case. Thus, black individuals indeed served on the jury and in fact made up half of the jury, and the State did not use all of its peremptory strikes to strike black individuals—in fact it used less than half. Under these circumstances, the ACCA did not violate clearly established Federal law in finding that Ingram had not met his burden of producing evidence that would allow the trial judge to infer that racial discrimination had occurred. As such, the ACCA properly held that the State was not required to provide race-neutral reasons for its strikes. *See Cent. Ala. Fair Hous. Ctr., Inc.*, 236 F.3d at 636 ("Indeed, we have stressed that "[n]o party challenging the opposing party's use of a peremptory strike . . . is entitled to an explanation for that strike, much less to have it disallowed, unless and until a prima facie showing of racial discrimination is made.") (quoting *United States v. Stewart*, 65 F.3d 918, 925 (11th Cir. 1995)).

Ingram also continues to rely, in support of a prima facie *Batson* claim, on his allegation that the Talladega County District Attorney has a history of racial discrimination, basing his argument solely on the *Walker* case in which District Attorney Rumsey was implicated. *Walker* was a capital murder-for-hire case tried in

---

[8]     Ingram incorrectly states in his federal habeas petition that the State had ten peremptory strikes. (Doc. 31 at 46, 49.)

November 1988 before the same judge that presided over Ingram's case. Walker, who was white, contended for the first time on direct appeal that Rumsey's exercise of the State's peremptory strikes to strike 11 of the 15 black veniremembers was racially discriminatory. *See* 586 So. 2d 49 (Ala. Crim. App. 1991) ("*Walker I*"). The ACCA remanded the case to the trial court for a *Batson* hearing in which Rumsey was to come forward with race-neutral reasons for each peremptory strike. *Id.* at 50. On remand, the trial court conducted a hearing in which Rumsey, despite it being roughly three years since the trial, attempted to provide the State's reasons for striking 11 of the 15 black veniremembers. *See* 611 So. 2d at 1134 ("*Walker II*"). The trial court found that the reasons as stated by Rumsey were sufficiently race-neutral. *See id.* at 1137. However, on return from remand, the ACCA reversed the judgment of the trial court and remanded the case for a new trial. *Id.* at 1143. The ACCA found Rumsey's stated reasons for striking various jurors suspect for different reasons. For some, Rumsey's stated explanations at the *Batson* hearing did not match his original notes made during voir dire three years earlier. *Id.* at 1134. Rumsey had to refresh his recollection by resorting to other persons, including his investigators and other law enforcement officials who knew many of the veniremembers from the community. *Id.* The ACCA primarily found many of the strikes suspect because Rumsey stated that he relied upon two things in striking several black veniremembers: (1) hearsay

information or his own personal knowledge, outside the courtroom, about these veniremembers having family members who were allegedly convicted felons or suspects in felony prosecutions, and (2) the fact that these veniremembers did not respond when asked during voir dire whether anyone's relatives had been prosecuted for a felony. *Id.* at 1139. The ACCA held that such reasons could not be race-neutral because Rumsey never sought to confirm or refute his assumptions about these potential jurors by further questioning them. *Id.* ("[T]he voir dire examination [was] void of meaningful questions directed to the black veniremembers in regard to the particular reasons given for striking them.").

*Walker* is distinguishable on its facts from this case and certainly does not stand for the proposition that the ACCA should have remanded Ingram's case for a *Batson* hearing. First of all, *Walker* was one out of a presumably large number of cases that District Attorney Rumsey tried before Ingram's trial judge. Additionally, the *Walker* prosecution, and the *Batson* hearing stemming from it, occurred seven and four years, respectively, prior to Ingram's trial. As the ACCA implied, the *Walker* case alone does not establish that Rumsey had "history of racial discrimination in jury selection," *Ingram*, 779 So. 2d at 1252-53. While evidence of past discrimination in jury selection is certainly a relevant consideration in whether an objector has made a prima facie case of *Batson* discrimination, a trial court must also consider all other

relevant circumstances, including whether the prosecutor has engaged in a pattern of strikes against black jurors; the prosecutor's questions and statements during voir dire examination; the failure of the prosecutor to ask meaningful questions to the struck jurors; and whether the subject matter of the case is racially or ethnically sensitive. *Madison v. Comm'r, Ala. Dep't of Corr.*, 677 F.3d 1333, 1337 (11th Cir. 2012) (internal citations omitted). *See also McNair v. Campbell*, 416 F.3d 1291, 1312 (11th Cir. 2005) ("[A] prosecutor's history of discrimination, while a relevant consideration, is not dispositive."). Of course, Ingram did not present evidence of any of these other considerations at trial, relying instead solely on the percentage of black veniremembers removed. And although he offered one instance of "past discrimination" on direct appeal, he did not connect anything from the *Walker* case to his case. For example, he did not take issue with or offer any specifics regarding District Attorney Rumsey's questioning of individual jurors or his failure to ask certain questions of individual jurors.

For these reasons, Ingram's other argument that the ACCA's decision was contrary to *Flowers v. Mississippi* also lacks merit. As Ingram acknowledges, *Flowers* was an "extreme case, involving a decades-long history with that prosecutor . . . ." (Doc. 43 at 6.) *See also Flowers*, 139 S. Ct. at 2251 ("[T]his is a highly unusual case. Indeed, it is likely one of a kind.") (Alito, J., concurring). Indeed, in *Flowers*, the same

prosecutor subjected the defendant to six successive trials for the same murders, during which the prosecutor struck a combined 41 of 42 black jurors. During the sixth trial, the prosecutor struck five of six black jurors, "engaged in dramatically disparate questioning of black and white prospective jurors[,]" and "engaged in disparate treatment of black and white prospective jurors . . . ." *Id.* at 2251. The Court "reiterate[d]" that it did not "decide that any one . . . fact[ ] alone would require reversal." *Id.* Rather, it emphasized that "all of the relevant facts and circumstances taken together establish that the trial court at Flowers's sixth trial committed clear error" in denying Flowers' *Batson* objection. *Id.* Ultimately, the Court concluded: "[W]e break no new legal ground. We simply enforce and reinforce *Batson* by applying it to the extraordinary facts of this case." *Id.* This case is not *Flowers.*

In sum, Ingram has failed to establish that the ACCA's determination of this issue "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(2).  Federal habeas relief is therefore foreclosed.

### C. Ingram's claim that his due process right to a fair trial was denied when the trial court refused to appropriate funds for an adequate mental health evaluation prior to trial

Ingram's third claim in this proceeding is that the trial court mishandled his defense counsel's request for mental health assistance in preparation for trial. He claims that the trial court should not have heard his request for mental health assistance in open court, with the participation of the State, or ordered that any report written about his mental health be provided to both the court and the State. He argues that these actions deprived him of the ability to facilitate his own defense strategy as it related to his mental health, and thus rendered the verdict in his trial unreliable. Ingram also complains that he was never provided with a consultation by a "qualified mental health professional" but was only seen by a "crisis intervention counselor" who produced a short letter finding him competent. (Doc. 31 at 51.)

Ingram raised this claim for the first time on direct appeal, and the ACCA denied it, offering the following detailed explanation of the facts surrounding Ingram's request for mental health assistance:

> Ingram contends that his "request for mental health assistance was handled in a manner inconsistent with the Fifth, Sixth, Eighth, and Fourteenth Amendments and Alabama law." He argues that the absence of any meaningful mental health assistance rendered his trial and sentencing fundamentally unfair. He asserts that the trial court erred when it held a hearing on his motion for a court-ordered mental examination in open court and ordered that the preliminary report be turned over to the court and the prosecutor, that he was never provided with a licensed psychologist or psychiatrist to perform a mental evaluation, and that he was never given a jury trial on the question of his competence to stand trial, as he had requested.

Ingram filed a pretrial motion on November 21, 1994, seeking a court-ordered mental examination by a "qualified mental health professional" to determine his "present" mental condition and his competency to stand trial, his mental condition at the time of the commission of the offense, and a hearing before a jury to determine his competency to stand trial. In his motion, he alleged the following:

> "As attorneys for the defendant, we question the defendant's competency to stand trial and believe that it is essential for a mental examination to be conducted in advance of trial because:
>
> "1. The defendant is charged with a capital offense that is punishable by death by electrocution. The defendant does not understand the serious nature of the offense with which he is charged and the possible consequences of his alleged acts.
>
> "2. The alleged acts of the defendant are of such a serious nature that we question the defendant's mental state."

(C.R. 26–26.)

At a hearing on the motion on January 12, 1995, the record shows the following:

> "MR. FANNIN [defense counsel]: Judge, we filed a motion for a mental exam approximately a month ago. I would just like to—
>
> "THE COURT: Has he been interviewed by the mental health folks yet?
>
> "MR. FANNIN: I don't think so, Judge.
>
> "THE COURT: What I'll do is order them to do a preliminary interview. If they come back with a recommendation that we need to do something else, we

will have a hearing on it and go forward. I will set the mental examination for next Tuesday afternoon at 1:00.

"MR. FANNIN: All right.

"THE COURT: Can you in the meanwhile talk to Mr. Gary Garner to see if he can either go over or get somebody in his office to do a preliminary?

"MR. FANNIN: Yes, sir, I'll do that. That's all we have other than the discovery which Mr. Gibbs [prosecutor] has told us he will give us soon.

"MR. GIBBS: Are we having the hearing on whether further examination is necessary?

"THE COURT: What I would want to have is this man or lady that goes over and makes a preliminary, that she be prepared to come testify in a hearing to see whether or not an evaluation should be done by Taylor Hardin [state mental health facility].

"MR. GIBBS: We'll do that Tuesday afternoon at the same time?

"THE COURT: It's tentatively set at 1:00."

(C.R. 13–14.)

At a second hearing on January 17, 1995, the following occurred:

"MR. FANNIN: Judge, we have previously filed that motion for mental examination. Last week at our status hearing you asked me to get in touch with Mental Health and get somebody down to talk to Mr. Ingram in jail. I talked with Mr. Garner today and he said that Mr. Ingram had not been interviewed because the man that does those

interviews is off for a period of time. He said that he expects him to be down there tomorrow to see Mr. Ingram.

"THE COURT: On Wednesday?

"MR. FANNIN: Yes.

"THE COURT: Would you ask him to give me a written report by Friday?

"MR. FANNIN: Yes, sir.

"THE COURT: Send it to [me] and I'll give a copy to the state and defendant. Then if it looks like we need to have a mental competency hearing we will set it down for sometime next week, which is during jury civil week, but we can work it in toward the end of the week.

"MR. FANNIN: All right, Judge.

"THE COURT: What's the man's name that will be doing the report?

"MR. FANNIN: Michael Quay, Q-u-a-y."

(C.R. 27–28.)

Ingram was subsequently examined by Michael H. Quay, M.S., a crisis intervention counselor at the Cheaha Mental Health Center, and Quay filed a report with the trial court on January 25, 1995, stating the following:

"The above individual was seen and underwent a mental status exam. This 23 year old black male was evaluated at the Talladega County jail at the request of the Circuit Court of Talladega County. Mr. Ingram does not appear to suffer from any form of mental illness, nor does he exhibit suicidal ideations. Overall, he is well-oriented, expressed

himself well verbally, and appears to be of average to above average intelligence.

"It is my professional opinion that Mr. Ingram meet[s] the following guidelines:

"1. He is mentally competent to stand trial.

"2. He is capable of understanding right from wrong.

"3. He understands the serious nature of being charged with capital murder.

"4. He is capable of assisting his attorneys with court proceedings.

"5. He does not appear to need further psychiatric evaluation."

(C.R. 27.)

"A defendant does not have a right to a mental examination whenever he requests one, and, absent such a right, the trial court is the screening agent of such requests. *Robinson v. State*, 428 So. 2d 167 (Ala. Cr. App. 1982); *Beauregard v. State*, 372 So. 2d 37 (Ala. Cr. App.), cert. denied, 372 So. 2d 44 (Ala. 1979). The defendant bears the burden of persuading the court that a reasonable and bona fide doubt exists as to the defendant's mental competency, and this is a matter within the discretion of the trial court. *Miles v. State*, 408 So. 2d 158 (Ala. Cr. App. 1981), cert. denied, 408 So. 2d 163 (Ala. 1982). In determining whether an investigation into the defendant's sanity is required, the trial court must determine if any factual data establish a reasonable ground to doubt the defendant's sanity. *Beauregard*, 372 So. 2d at 43. Where the trial court finds that the evidence presents no reasonable grounds to

doubt the defendant's sanity, the standard of appellate review is whether the trial court abused its discretion. *Id.*"

*Cliff v. State*, 518 So. 2d 786, 790 (Ala. Crim. App. 1987). *See also Stewart v. State*, 562 So. 2d 1365 (Ala. Crim. App. 1989); *Russell v. State*, 715 So. 2d 866 (Ala. Crim. App. 1997); Ala. R. Crim. P. 11.

Ingram's burden for purposes of his motion seeking a state-funded mental evaluation was to establish a reasonable doubt as to his competency to stand trial or to establish that his sanity at the time of the offense would be a significant factor at trial. Based on the record of the proceedings before us, we find that he did not meet this burden. The motion requesting a mental examination was very general and conclusory. The only allegation made in the motion was that Ingram did not understand the serious nature of the offense or the possible consequences of his acts. No facts were alleged in support of the allegation. The motion amounted to nothing more than an unsworn and unsubstantiated statement by defense counsel. No evidence was offered to support the motion. "In the absence of any evidence, the mere allegations by counsel that the defendant is incompetent to stand trial do not establish reasonable grounds to doubt the defendant's sanity, and warrant an inquiry into his competency." *Cliff v. State*, 518 So. 2d at 791. On the other hand, the trial court had before it, for its review, a court-ordered mental evaluation from a qualified mental health professional, stating that Ingram did not suffer from any form of mental illness, that he was mentally competent to stand trial, that he understood the nature of the charges, and that he was capable of assisting his counsel in preparing and presenting his defense. We note that no plea of not guilty by reason of mental disease or defect was filed in this case, and Ingram's mental condition was not an issue in the trial of the case. Ingram presented no evidence that would have warranted further inquiry into his mental state. Accordingly, we find no abuse of the trial court's discretion in its denial of Ingram's motion.

Ingram's contention that the trial court erred in holding hearings on his motion in open court and in ordering that copies of the preliminary report of his mental examination be delivered to the court and to the prosecutor is without merit. The procedure followed by the

trial court in this case was proper and reasonably necessary for screening the request for a court-ordered mental examination. We note that Ingram did not object to the procedure, but that he, in fact, agreed to it. Ingram's contentions that the trial court erred in failing to provide him with a licensed psychologist or psychiatrist to conduct the mental examination and the failure to hold a jury trial on the question of his competency to stand trial are, likewise, without merit. The provisions of Rule 11.2, Ala. R. Crim. P., concerning a jury trial to determine competency to stand trial, and Rule 11.3 concerning appointment of experts such as psychologists and psychiatrists do not become operative until the trial court has reasonable grounds to doubt a defendant's sanity. Once evidence exists to doubt the defendant's competency to stand trial, the procedure in Rule 11.2 through 11.8 should be followed. Here there was no such evidence. Thus, further inquiry into Ingram's mental state was unwarranted.

Further, we find that the procedure followed by the trial court did not deprive Ingram of any constitutional right, and it complied with Alabama law. And, further, his assertion that the procedure rendered his trial and sentencing fundamentally unfair is unsupported by the record and without merit. Ingram's contentions that the trial court erred in holding hearings on his motion in open court, ordering that the preliminary report be delivered to the court and prosecutor, failing to provide him with a licensed psychologist or psychiatrist, and failing to provide him with a jury trial on the question of his competency to stand trial, are, under the facts of this case, without merit.

*Ingram*, 779 So. 2d at 1269-72.

Because the ACCA considered and denied this claim on the merits, Ingram

must establish not only that this claim is meritorious but also that the ACCA's

rejection of the claim[9] meets one of § 2254(d)'s exceptions—i.e., it was either an

---

[9]     Ingram raised this claim in his petition for certiorari to the Alabama Supreme Court, but that Court affirmed the ACCA's judgment without specific discussion of this claim. *See Ex parte Ingram*, 779 So. 2d at 1285. Because the Alabama Supreme Court affirmed the ACCA's judgment

unreasonable determination of the facts in light of the evidence presented in the state court proceeding or was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. Ingram invokes only § 2254(d)(2), arguing that the ACCA's opinion is contrary to or an unreasonable application of *Ake v. Oklahoma*, 470 U.S. 68 (1985), and *McWilliams v. Dunn*, 137 S. Ct. 1790 (2017).

Ingram contends that the fact that the trial court ordered that any preliminary competency report be provided to both the court and the State violated the rule announced in *Ake*. *Ake* established that when an indigent "defendant demonstrates . . . that his sanity at the time of the offense is to be a significant fact at trial, the State must" provide the defendant with "access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." 470 U.S. at 83. Notably, *Ake* requires that, before an indigent criminal defendant is entitled to expert psychiatric assistance at State expense, he must make "a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial." *Id*. at 74. Simply put, Ingram failed to meet his burden of establishing, as a threshold matter, that further inquiry into his mental state was necessary. As the ACCA noted, "[N]o plea of not guilty by reason

---

without discussion of this claim, the Court looks to the ACCA's analysis. *See Wilson*, 138 S. Ct. at 1192, *supra*, note 7.

of mental disease or defect was filed in this case, and Ingram's mental condition was not an issue in the trial of the case." *Ingram*, 779 So. 2d at 1271. Thus, the ACCA could not have applied the rule in *Ake* in an unreasonable manner to the facts of Ingram's case because the threshold requirement that Ingram's mental state be a significant factor was never met.

Nor does the Supreme Court's opinion in *McWilliams* entitle Ingram to relief. As an initial matter, the facts in this case are clearly distinguishable from the facts in *McWilliams*. As already noted, Ingram's competency at trial, or need for mental health assistance during his penalty phase, was not a factor during either phase of his trial. In contrast, in *McWilliams*, defense counsel received, two days before McWilliams' judicial sentencing hearing, an opinion from a neuropsychologist employed by Alabama's Department of Mental Health that McWilliams might suffer from some "genuine neuropsychological problems." 137 S. Ct. at 1796. At the sentencing hearing, McWilliams' counsel requested more time to review the report as well as obtain the assistance of a mental health expert, but the court denied the request and sentenced McWilliams to death. *Id.* Those facts do not exist in the present case. To the contrary, the court-ordered mental health evaluation produced evidence that Ingram "does not appear to need further psychiatric evaluation." *Ingram*, 779 So. 2d at 1270. Nor did the ACCA apply the governing principle from

*McWilliams* in an unreasonable manner to Ingram's case. This is because in *McWilliams*, the Supreme Court expressly held that the "conditions that trigger application of *Ake*" were present, namely, that the defendant's "sanity at the time of the offense[] was seriously in question." 137 S. Ct. at 1798 (internal quotation marks omitted). Because those conditions were not present in Ingram's case, the rule that an indigent defendant is entitled to mental health assistance at State expense did not apply. The ACCA's conclusion finding as such was reasonable.

Because Ingram has not established that the ACCA's determination of this issue "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1) - (d)(2), this Court will defer to the state courts' decision on this issue and deny relief on this claim.

### D.   Ingram's claim that he was denied the effective assistance of counsel during the guilt phase of his trial

Ingram next argues that his defense counsel made numerous errors during trial that constituted deficient performance and prejudiced him. First, Ingram argues that his defense counsel should have investigated more thoroughly the veracity of the testimony of several witnesses at trial, most importantly Cox, a participant in the murder who testified against Ingram pursuant to a plea bargain. Ingram says that Cox lied at his trial to make Ingram appear more culpable and Boyd appear less culpable,

given that Cox and Boyd were involved in a drug enterprise that did not involve Ingram. Ingram also asserts that trial counsel should have investigated more thoroughly the truthfulness of the testimony of several other eye-witnesses, because these individuals were habitual drug users who were picked up by police during an illicit dice game and forced to testify against Ingram through threats of prosecution.

Second, Ingram contends that his defense counsel should have more thoroughly cross-examined Cox and another witness at his trial, Julie Baker Williams ("Ms. Williams"). Ingram faults his counsel for failing to cross-examine Cox on the fact that his testimony at trial differed somewhat from his statement to law enforcement immediately after he was arrested. Specifically, Ingram points out that Cox testified at trial that himself, Ingram, Boyd, and Ackles drove together in a van and abducted the victim, Gregory Huguley ("Huguley"), but that Cox thereafter left the van, picked up his own car, and followed the van to the gas station and the ballfield where Huguley was murdered. Ingram states that Cox's original statement to police placed himself, and the other three defendants, inside the van for the duration of the kidnaping and drive to the ballfield. Ingram also states that there were inconsistencies between Cox's statements, his testimony, and the testimony of other witnesses that cast doubt on the veracity of Cox's account on issues such as: who forced Huguley into the van (Cox said Ingram did so; other witnesses indicated it

was Boyd), and who made statements that they would shoot Huguley if he did not

get in the van (Cox said Ingram did so; other witnesses indicated it was Boyd).

With regard to Ms. Williams, Ingram also argues that his defense counsel were

ineffective for failing to confront her with her previous statement to police. Ms.

Williams testified at trial that Ingram told her he had killed Huguley by setting fire

to him. However, Ingram points out that in a statement to police dated October 30,

1993, Ms. Williams stated that Ingram told her Boyd was the one who set fire to

Huguley and that Ingram himself was afraid of Boyd. Ingram contends that had

counsel properly cross-examined these witnesses, there exists a reasonable

probability that the result of his trial, especially the sentencing phase, would have

been different because the testimony of both Ms. Williams and Cox created the

impression that Ingram was the "ringleader" in this offense, contrary to their earlier

statements. Ingram also contends that his counsel should have objected to the

State's direct examination of Cox at trial on the grounds that the State improperly

vouched for the truth of Cox's testimony by emphasizing that Cox was required to

testify truthfully pursuant to his plea agreement.

Third, Ingram argues that his defense counsel were ineffective for failing to

obtain favorable rulings on their objections to the introduction of 21 graphic

photographs of the crime scene and severe burns on Huguley's body. According to

Ingram, since the uncontested testimony at trial showed that Huguley was set on fire at a seldom-used ballfield, there was no need for numerous inflammatory photographs of his body. Similarly, Ingram argues that his defense counsel failed to object to the fact that the State exposed the jury throughout the trial to the presence of a plastic vessel containing the victim's hands, which had been severed by the forensic investigator for the purpose of making comparison with known fingerprints easier.

Ingram raised this ineffective assistance of counsel claim for the first time in his Rule 32 petition, and he was given the opportunity to prove these allegations at his evidentiary hearing on April 3-4, 2013. However, at the outset of the hearing Ingram's post-conviction counsel stated that he was "withdrawing" the claims "having to do with ineffective assistance of counsel at the guilt or innocence phase of the proceeding," and then, in accordance with that waiver, presented no evidence in support of these claims at the hearing. (Vol. 31, Tab #R-102, C. 1 at 25-26.) In the circuit court's order dismissing Ingram's fifth amended Rule 32 petition, it stated the following concerning the withdrawal of this claim: "Because Ingram chose to withdraw his allegations . . . and chose not to present any evidence with regard to those allegations, Ingram abandoned those claims and, thus, those claims are denied." (Vol. 29, Tab #R-97, C. 907 at 956-58). The circuit court cited several

Alabama state court opinions similarly denying claims because petitioners had failed to present evidence to support them at evidentiary hearings. (*Id.* at 958.) The circuit court did not address the claim on the merits but dismissed it solely because Ingram had abandoned it.

A petitioner must afford the state courts a full and fair opportunity to decide any federal constitutional claims presented in the federal habeas petition, which includes giving the "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate process." *O'Sullivan*, 526 U.S. at 842-45. Ingram abandoned the claim in his Rule 32 proceedings in the circuit court, and thus, he has not exhausted the claim in the state courts. Ingram would be barred from attempting to raise the claim now in state court under Rule 32.2(c), Ala. R. Crim. P. (statute of limitations bar) and under Rule 32.2(b), Ala. R. Crim. P. (successive petition bar). Thus, because any state remedy with respect to the claim is procedurally barred by the state procedural rules, the claim is procedurally defaulted from this Court's review. *See Collier v. Jones*, 910 F.2d 770, 772 (11th Cir. 1990) ("when a petitioner has failed to present a claim to the state courts and under state procedural rules the claim has become procedurally defaulted, the claim will be considered procedurally defaulted in federal court.").

Ingram does not attempt to overcome the procedural default of this claim by showing cause for the default and prejudice attributable thereto, or by demonstrating that this Court's failure to consider the claim will result in a fundamental miscarriage of justice. *See Coleman*, 501 U.S. at 749–50. Although Ingram asserts that Alabama's post-conviction process was ineffective in safeguarding his rights because it precluded him from establishing the factual foundations of this claim (doc. 43 at 8), such an argument falls flat with specific regard to this claim. This is because the circuit court gave Ingram an opportunity to present evidence in support of this claim at the evidentiary hearing, but Ingram chose not to do so. Because the claim is unexhausted and procedurally defaulted pursuant to 28 U.S.C. § 2254(b)-(c), it is due to be denied.

### E. Ingram's claim that he was denied the effective assistance of counsel in the penalty phase of his trial

Ingram contends that his defense counsel were ineffective on several occasions during the penalty phase of his trial. He argues that counsel failed to investigate and present evidence concerning Ingram's family background, educational background, and institutional adaptability and good behavior while incarcerated. Ingram also contends that his counsel should have procured a neurotological expert to investigate the possibility that Ingram suffered mental and neurological problems due to his possible exposure to lead paint and polychlorinated

biphenyls ("PCBs") while in utero and/or during his childhood. Ingram contends that presentation of such evidence in mitigation would have spared him the death penalty. Finally, Ingram faults his counsel for failing to object to various allegedly improper statements made by the prosecution in closing arguments during the penalty phase.

### 1.    Sub-Claims (1), (2), and (3): the § 2254(d)(1)-(2) analysis

Ingram raised these subclaims during his Rule 32 proceedings, and each was considered and rejected on the merits by the circuit court, after an evidentiary hearing, and then on appeal by the ACCA. As such, Ingram must show that one of the exceptions found in § 2254(d)(1)-(2) applies to the state courts' decisions before this Court may grant relief. Before addressing each sub-claim in turn, the ACCA's general analysis with respect to these claims is worth repeating here:

> In Ground III of Ingram's Fifth Amended Petition, Ingram asserted that trial counsel were ineffective in their development and presentation of mitigation evidence. Ingram alleged in his petition that trial counsel failed to investigate and present evidence that he suffered from low cognitive functioning and neurological impairments; evidence of his substandard living conditions, which exposed him to lead and other environmental toxins; evidence of his good behavior during his pretrial incarceration; and evidence of his family background.

> > While counsel has a duty to investigate in an attempt to locate evidence favorable to the defendant, "this duty only requires a reasonable investigation." *Singleton v. Thigpen*, 847 F.2d 668, 669 (11th Cir. (Ala.) 1988), cert. denied, 488 U.S. 1019, 109 S. Ct. 822, 102 L. Ed. 2d 812 (1989)

(emphasis added). *See Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066; *Morrison v. State*, 551 So. 2d 435 (Ala. Cr. App. 1989), cert. denied, 495 U.S. 911, 110 S. Ct. 1938, 109 L. Ed. 2d 301 (1990). Counsel's obligation is to conduct a "substantial investigation into each of the plausible lines of defense." *Strickland*, 466 U.S. at 681, 104 S. Ct. at 2061 (emphasis added). "A substantial investigation is just what the term implies; it does not demand that counsel discover every shred of evidence but that a reasonable inquiry into all plausible defenses be made." *Id.*, 466 U.S. at 686, 104 S. Ct. at 2063.

> The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.

*Jones v. State*, 753 So. 2d 1174, 1191 (Ala. Crim. App. 1999).

> "[T]he scope of the duty to investigate mitigation evidence is substantially affected by the defendant's actions, statements, and instructions. As the Supreme Court explained in *Strickland*, the issue of what investigation decisions are reasonable 'depends critically' on the defendant's instructions . . . ." *Cummings v. Secretary, Dep't of Corr.*, 588 F.3d 1331, 1357 (11th Cir. 2009).

*James v. State*, 61 So. 3d 357, 364 (Ala. Crim. App. 2010).

*Washington v. State*, 95 So. 3d 26, 40-41 (Ala. Crim. App. 2012). Further,

> As an initial matter, we "must recognize that trial counsel is afforded broad authority in determining what evidence will be offered in mitigation." *State v. Frazier* (1991), 61 Ohio St. 3d 247, 255, 574 N.E.2d 483. We also reiterate that post-conviction proceedings were designed to redress denials or infringements of basic constitutional rights and were not intended as an avenue for simply retrying the case. [*Laugesen*] *v. State*, [(1967), 11 Ohio Misc. 10, 227 N.E.2d 663] *supra; State v. Lott*, [(Nov. 3, 1994), Cuyahoga App. Nos. 66388, 66389, 66390] *supra*. Further, the failure to present evidence which is merely cumulative to that which was presented at trial is, generally speaking, not indicative of ineffective assistance of trial counsel. *State v. Combs* (1994), 100 Ohio App. 3d 90, 105, 652 N.E.2d 205.

*Jells v. Mitchell*, 538 F.3d 478, 489 (6th Cir. 2008).

> "[C]ounsel is not required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy. Counsel must be permitted to weed out some arguments to stress others and advocate effectively." *Haliburton v. Sec'y for the Dep't of Corr.*, 342 F.3d 1233, 1243–44 (11th Cir. 2003) (quotation marks and citations omitted); *see Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1348–50 (11th Cir. 2005) (rejecting ineffective assistance claim where defendant's mother was only mitigation

witness and counsel did not introduce evidence from hospital records in counsel's possession showing defendant's brain damage and mental retardation or call psychologist who evaluated defendant pre-trial as having dull normal intelligence); *Hubbard v. Haley*, 317 F.3d 1245, 1254 n.16, 1260 (11th Cir. 2003) (stating this Court has "consistently held that there is 'no absolute duty . . . to introduce mitigating or character evidence'" and rejecting claim that counsel were ineffective in failing to present hospital records showing defendant was in "borderline mentally retarded range") (brackets omitted) (quoting *Chandler* [*v. United States*], 218 F.3d [1305] at 1319 [(11th Cir. 2000)]).'

*Wood v. Allen*, 542 F.3d 1281, 1306 (11th Cir. 2008). "The decision of what mitigating evidence to present during the penalty phase of a capital case is generally a matter of trial strategy." *Hill v. Mitchell*, 400 F.3d 308, 331 (6th Cir. 2005).

*Dunaway v. State*, 198 So. 3d 530, 547 (Ala. Crim. App. 2009), rev'd on other grounds by *Dunaway v. State*, 198 So. 3d 567 (Ala. 2014).

"Although Petitioner's claim is that his trial counsel should have done something more, we first look at what the lawyer[s] did in fact." *Chandler v. United States*, 218 F.3d 1305, 1320 (11th Cir. 2000). During the penalty phase, trial counsel presented the testimony of seven family members and one friend. The witnesses portrayed Ingram as a good, friendly person. Ingram was described as a quiet and well-mannered youth who was always respectful to his mother. Carla Parker, Ingram's sister, and Dorothy Ackles, Ingram's mother, testified that Ingram had been a good student, and a number of witnesses spoke of Ingram's success in athletics, which came despite his suffering from a leg malformation that required his use of leg braces as a small child.

Multiple witnesses testified to Ingram's positive relationships with their children and their desire for Ingram to live so that he could maintain those relationships. This included Ingram's relationship with his own daughter, who was an infant at the time of trial. The jury was also made aware of Dorothy Ackles's suffering from brain cancer. Dorothy Ackles was too weak to travel to court, so she was permitted to testify through a videotaped deposition. Parker testified that she did not believe her mother could survive the stress of Ingram's being sentenced to death.

The circuit court made the following findings regarding trial counsel's mitigation strategy:

> Here, at the evidentiary hearing, Ingram's trial counsel, Fannin, testified that he and his co-counsel, Nelson, jointly investigated Ingram's case. In so doing, they interviewed witnesses at the scene of the kidnapping and went to the location where Ingram and his codefendants burned Huguley. Additionally, Fannin explained that he talked to Ingram's family and Ingram, and, because of the nature of the case, they thought it would be a good idea to request a mental evaluation of Ingram, which evaluation indicated that Ingram did not have any mental-health issues. Although his trial counsel "did not have a good feeling about the penalty phase" of Ingram's trial, they hoped that could "put on enough mitigation evidence to keep" from having the death penalty imposed on Ingram. [(R. 58.)]

> According to Fannin, the strategy during mitigation was to demonstrate that Ingram did not have a significant criminal history, that he was a good child, that he was good in school, that he was well-liked in his community, that his family loved him, that his friends loved him, and that he was a young man when the offense occurred. [(R. 60.)] Although Fannin acknowledged that they did not hire an investigator or a mitigation expert, he stated that they spoke with Ingram's family members, who assisted them

in obtaining the names of people who would testify on Ingram's behalf. [(R. 58-59.)] Fannin, fearing that Ingram's mother's health would not allow her to testify at Ingram's trial, arranged for her testimony to be taken by videotaped deposition. In her deposition, Ingram's mother discussed Ingram's background, medical issues, and educational history, and asked the jury to spare her son's life.

As set out above, Fannin and Nelson deployed this strategy during the penalty phase of Ingram's trial by calling eight witnesses to testify, including Ingram's mother's videotaped deposition. The testimony from these witnesses touched on each of the areas that Fannin explained they wanted to focus on in mitigation. Counsel's strategy was successful to a degree, convincing one juror to recommend a sentence of life without the possibility of parole.

(C. 966-67.) The circuit court concluded that "trial counsel had a reasonable mitigation strategy and investigated that strategy by interviewing Ingram's family and friends." (C. 968.)

(Vol. 41, Tab #R-107, at 13-18.)

### i.    *alleged failure to present evidence of Ingram's family background*

Ingram argues that his counsel should have also investigated and presented

evidence of the following information about his family background: he was raised in

the housing projects of Brooklyn, New York, which were known to be contaminated

with lead; he witnessed many acts of violence as a child; he was himself the victim of

crimes of violence including one occasion where he was "jumped" by a group of boys

from another housing project and was beaten so badly that he had to be hospitalized; there was domestic violence in his home; his mother had at least two "live-in" boyfriends during his childhood and adolescence who were each violent alcoholics, and one of them had previously been incarcerated for killing his former wife; Ingram and his siblings were afraid of these men; Ingram also witnessed numerous fights between his mother and these men when they became drunk and verbally and physically abusive; police were often called to the house because of the domestic turmoil and chaos; and on occasion Ingram's older siblings would remove him from the house or hide him for his own protection.

Ingram raised this argument for the first time in his Rule 32 proceedings and was given the opportunity to present evidence in support of this claim during the evidentiary hearing. The circuit court, and then the ACCA, denied relief. The ACCA's opinion on this sub-claim is provided as follows:

> Ingram argues that trial counsel failed to investigate and to present evidence of his family background. Specifically, Ingram asserts that trial counsel should have investigated evidence that his mother cohabitated with two boyfriends who were violent alcoholics and that his childhood was marked by poverty and violence.
>
> The circuit court made the following findings regarding this claim:
>
>> "In his petition, Ingram alleged that trial counsel failed to investigate and present evidence of Ingram's childhood 'living in housing projects in Brooklyn, New York,' which

was 'substandard' and possibly 'contaminated with lead'; that, while in Brooklyn, Ingram 'witnessed many acts and crimes of violence, and was himself the victim of crimes of violence' -- specifically, that he had been '"jumped" by a group of boys' and had to be hospitalized; and that Ingram witnessed acts of domestic violence between his mother and two different live-in boyfriends 'when they became drunk.' Ingram, however, failed to prove that his counsel's performance was deficient when they did not present this specific evidence of Ingram's family background to the jury.

"Indeed, the totality of the questions to Ingram's trial counsel during the evidentiary hearing regarding Ingram's family background was as follows:

> "[Ingram's Rule 32 Counsel]: What about the circumstances of his upbringing?

> "[Mr. Fannin]: Well, we talked to his mother about when he was a child and some of the circumstances of his youth. I can't recall what she said, but I remember talking to her about that.

> "[Ingram's Rule 32 Counsel]: Any other witnesses or sources of information on that topic outside of her?

> "[Mr. Fannin]: His sister may have talked about his childhood. I can't specifically recall.

> "[Ingram's Rule 32 Counsel]: Would there have been anyone beside those two?

> "[Mr. Fannin]: Not that I can recall. I'm not saying there were not, but I can't recall.

[(R. 60-61.)] . . .

"Ingram failed to ask his trial counsel whether he had gained evidence from any of the witnesses that he had spoken to in preparation for the penalty phase of Ingram's trial about the specific areas of Ingram's family background mentioned in Ingram's Rule 32 petition -- i.e., his witnessing acts of violence in Brooklyn, his getting 'jumped' by a group of boys in Brooklyn, his living in 'substandard' housing in Brooklyn, and his witnessing acts of domestic violence between his mother and her boyfriends. Because Ingram's Rule 32 counsel failed to ask his trial counsel whether trial counsel was aware of these specific aspects of Ingram's family background, this Court cannot determine whether Ingram's trial counsel either knew of these parts of Ingram's background and made a strategic choice to not present that evidence, or whether trial counsel did not present this evidence simply because they did not know of the existence of these aspects of Ingram's background. Thus, the record is silent as to the reasoning behind counsel's actions and, thus, '"'the presumption of effectiveness is sufficient to deny relief on [an] ineffective assistance of counsel claim.'"' *Dunaway v. State*, [198] So. 3d [530], [547] (Ala. Crim. App. 2009) (quoting *Howard v. State*, 239 S.W.3d 359, 367 (Tex. App. 2007)).' *Broadnax v, State*, 130 So. 3d 1232, 1255-56 (Ala. Crim. App. 2013).

"Additionally, Ingram failed to prove that he was prejudiced by his trial counsel's failure to present this specific evidence of Ingram's family background. Indeed, this Court is not convinced that, even if his trial counsel had presented such evidence, there would be a reasonable probability that the 'sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' *Strickland*, 466 U.S. at 695. For example, although Ingram's brother, Calvin, and his sister, Carla, testified at the evidentiary hearing

that their mother's boyfriend -- Walter Davis -- would get into physical altercations, that testimony would have opened the door for the State to point out that Ingram's sister grew up in the same environment but had not committed a capital murder and, thus, would have undermined Ingram's mitigation case. *See, e.g., Grayson v. Thompson*, 257 F.3d 1194, 1227 (11th Cir. 2001) ('The fact that Grayson was the only child to commit such a heinous crime also may have undermined defense efforts to use his childhood in mitigation.'). Such evidence was, at best, a double-edged sword, and [a]n ineffective assistance claim does not arise from the failure to present mitigation evidence where that evidence presents a double-edged sword." *Reed v. State*, 875 So. 2d 415, 437 (Fla. 2004).'"

*Washington v. State*, 95 So. 3d 26, 53 (Ala. Crim. App. 2012)."

(C. 970-74.) Additionally, this Court notes that offering evidence of the alleged violence of Dorothy Ackles's boyfriends would appear to conflict with trial counsel's strategy. Ingram's mother was too ill to attend his trial, so trial counsel traveled to her and had her deposition videotaped to ensure that she was not only heard but also seen by the jury. Also, Carla Parker told the jury that she did not believe her mother could survive the stress of Ingram's being sentenced to death. Thus, there is no question that trial counsel sought to portray Dorothy Ackles as a sympathetic figure to make her plea of mercy more meaningful. It seems, then, unreasonable to expect trial counsel also to malign Dorothy Ackles by offering evidence that she exposed Ingram and her other children to men Ingram alleged to be violent alcoholics. *See Whatley v. Warden, Georgia Diagnostic and Classification Center*, 927 F.3d 1150, 1178 (11th Cir. 2019) (holding that offering evidence that petitioner's great-uncle raped his mother "no doubt conflicts with the mitigation strategy" of painting a positive picture of his great-uncle, who raised him). (footnote omitted.)

(Vol. 41, Tab #R-107, at 25-29.)

Under 28 U.S.C. § 2254(d)(1)-(2), because this sub-claim was addressed on the merits, Ingram's task is to establish not only that this claim is meritorious but also that the ACCA's rejection of the claim[10] was either an unreasonable determination of the facts in light of the evidence presented in the state court proceeding or was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.

Ingram does not meet his burden of pleading either one of these avenues of relief. The only Supreme Court precedent Ingram refers to aside from *Strickland* is *Ake v. Oklahoma*, claiming that his counsel's failure to secure the assistance of a mitigation investigator or social worker violated *Ake*'s directive that state courts must provide indigent defendants with the "basic tools of an adequate defense or appeal." (Doc. 31 at 60 & n.216 (quoting *Ake*, 470 U.S. at 77)). As noted previously, in *Ake*, the Supreme Court recognized competent psychiatric assistance as one such "basic tool," but only when the defendant demonstrates that his sanity at the time of the offense is to be a significant factor at trial. *Ake*, 470 U.S. at 83. *Ake* does not establish that Ingram was entitled to a mitigation expert to prepare for the penalty phase of his trial.

---

[10]    Ingram exhausted this claim in the state courts. He raised this claim in his petition for certiorari to the Alabama Supreme Court (Vol. 42, Tab #R-109, at 29-50), but the Court denied certiorari. (*Ex parte Ingram*, Vol. 42, Tab #R-110.)

Nor has Ingram sustained his burden of proof that the ACCA's decision was contrary to *Strickland*. The ACCA reasonably affirmed the Rule 32 court's finding that the record is silent as to why Ingram failed to question counsel as to whether he knew about specific aspects of his family background or why counsel chose not to present this evidence if they knew about it. The ACCA also properly affirmed the Rule 32 court's finding that Ingram failed to prove that he was prejudiced by counsel's actions. While Ingram argues that his counsel's failure to present this evidence was not a matter of strategy but instead a failure to investigate entirely, that assumption is not supported by the record, which is silent on his counsel's strategy in calling the eight family and friends witnesses they called, despite Ingram having an opportunity to question his counsel at the evidentiary hearing on such matters.

In sum, Ingram has not established that the ACCA's determination of this issue "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or that the State court's determination of this issue "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(1) - (d)(2). Federal habeas relief is therefore foreclosed.

> ii.   *alleged failure to present evidence of Ingram's educational background*

Ingram also argues that his defense counsel should have investigated and presented evidence that he suffers from mental health impairments. He contends that if his counsel had contacted his former teachers, then they would have discovered that he struggled academically from the time he entered school; that his grades were very low; that he was both placed in classes for the lowest performers, including the Constantine Appalachian Program to help struggling students, which was a form of special education, and was also referred for testing in the second grade for learning disabilities; and that he dropped out of school in the tenth grade.

Ingram raised this argument for the first time in his Rule 32 proceedings, and the ACCA affirmed the circuit court's denial of relief on this claim as follows:

> Ingram argues that trial counsel failed to investigate and to present evidence of his academic history. Ingram alleged that trial counsel made no effort to speak to Ingram's teachers or to learn about his academic abilities. Ingram asserted in his petition that had trial counsel conducted a reasonable investigation into his educational history, they would have learned that he struggled academically, not due to a lack of effort, but rather due to an inability to learn. Also, Ingram asserts, trial counsel would have learned that he at one time was enrolled in a form of special education, and that he had been referred in second grade for testing regarding possible learning disabilities.
>
> The circuit court made the following findings with respect to Ingram's educational history:
>
> > "Regarding their investigation into Ingram's educational history, Ingram's trial counsel were only asked if trial counsel had considered information about Ingram's

performance in school, to which trial counsel responded, "I can't recall. It would be in the record if we had" [(R. 60.)]; and asked whether trial counsel had met with any of Ingram's teachers or other school personnel, to which trial counsel responded, "I can't remember." [(R. 60.)] Ingram's Rule 32 counsel however, did not ask trial counsel whether he researched Ingram's educational history as it relates to any alleged mental-health issues.

"Although Ingram did not ask his trial counsel questions related to Ingram's educational history as it relates to any alleged mental-health issues, Ingram did question June Allred -- Ingram's second grade teacher -- and Glenda Jackson -- his [Constantine Appalachian Program ("CAP")] teacher -- regarding these allegations.

"Allred testified that, at the time Ingram was in second grade, she was employed at Johnston Elementary School in the Anniston City School System teaching second grade. Although she did not remember Ingram, Allred confirmed that she 'filled out a referral for him to be evaluated for special services,' to see if Ingram needed 'more additional help than he gets in the ordinary classroom.' [(R. 127.)] According to Allred, she referred Ingram to be evaluated because, she said, 'he was not able to perform on grade level' -- 'something she seldom did for second graders. Allred stated that, at the time of Ingram's trial she lived in Anniston but Ingram's trial counsel did not contact her; had they done so she would have been willing to talk to them.

"On cross-examination, Allred conceded that she did not specifically remember why she referred Ingram for testing. Additionally, Allred explained that she did not remember that the evaluation indicated that Ingram was not in need of special services. Indeed, the documents Ingram admitted as Petitioner's Exhibit 3 included a letter dated December 20, 1978, which letter was titled 'Notification

that Student is not Exceptional and not Eligible for Special Education,' wherein it was explained that Ingram 'is not in need of special programs and services as outlined in the state and federal legislation related to exceptional students.' (Emphasis in original).

"Glenda Jackson testified that she taught at Constantine Elementary School from 1982-1984, and had Ingram as one of her students. According to Jackson, Ingram rarely got into trouble, but his 'biggest problem' was that he did not 'finish his  work, and [she] had to call his mother, and his mother would come to the school.' [(R. 135.)] Jackson explained that the classroom in which she taught Ingram was a 'combined classroom' for children 'whose academic level was lower.' [R. 136.)] Jackson explained that the idea behind the program was to put students together who were academically on a similar level as opposed to putting them together based on age. Jackson stated that Ingram was in the fifth grade but was paired with fourth grade children because his academic level was on par with fourth grade -- not fifth grade. Jackson stated that Ingram struggled in school. Jackson, like Allred, testified that Ingram's trial counsel did not contact her, but, had they done so, she would have been willing to speak with them.

"On cross-examination, Jackson confirmed that the 'combined classroom' approach was not a special education program. Jackson, on redirect examination, explained that the program was for children who 'did not meet the criteria' for special education 'according to the testing that's done for special education kids.' [(R. 143.)] Jackson further explained that the program was designed 'to catch those kids who were not special ed but who were not on the regular level academically but who fell in between where they needed added attention, added help, added assistance so that they excel well in life.' [(R. 143-44.)]"

(R. 978-81.) The circuit court found that certain portions of Jackson's testimony -- that Ingram was not a troublemaker and that he was well-mannered -- were cumulative to testimony actually presented during the penalty phase. "'[F]ailing to introduce additional mitigation evidence that is only cumulative of that already presented does not amount to ineffective assistance.' *Jalowiec v. Bradshaw*, 657 F.3d 293, 319 (6th Cir. 2011) (citing *Nields v. Bradshaw*, 482 F.3d 442, 454 (6th Cir. 2007))." *Stallworth v. State*, 171 So. 3d 53, 79 (Ala. Crim. App. 2013). The circuit court also found that portions of Allred's and Jackson's testimony that related to Ingram's academic difficulties conflicted with the penalty phase testimony of Joyce Elston, Carla Parker, and Dorothy Ackles, who testified to Ingram's succeeding in school. *See Connor v. Secretary, Florida Dept. of Corrections*, 713 F.3d 609, 626 (11th Cir. 2013) (holding trial counsel acted reasonably in omitting evidence that would have contradicted other evidence presented at penalty phase). Finally, the circuit court found lacking Ingram's evidence that he was referred for testing for a learning disability and that he was enrolled in special education:

> "Indeed, although Ingram did present evidence that he was referred for testing in the second grade for special education, the result of that testing (as demonstrated by his own exhibit) was that he did not qualify for special-education classes. Additionally, although Ingram alleged that his 'combined classroom' experience with Jackson was a 'form of special education,' Jackson's testimony at the evidentiary hearing established that the 'combined-classroom' approach was not a form of special education." (C. 984.)

(Vol. 41, Tab #R-107, at 20-23.)

Ingram has failed to plead anything necessary to establish that the ACCA's[11] rejection of this sub-claim meets one of the exceptions in 28 U.S.C. § 2254(d)(1)-(2). In fact, Ingram fails to cite to any Supreme Court authority to support his argument that the state courts unreasonably decided this claim. In any event, the ACCA thoroughly analyzed this ineffective assistance of counsel sub-claim, and reasonable jurists could not conclude that the court erred in its decision. This claim is thus due to be dismissed.

### iii.   *alleged failure to present evidence of Ingram's good behavior in prison and institutional adaptability*

Ingram also contends that his defense counsel should have subpoenaed officers of the Talladega County Jail, where Ingram was housed for 20 months awaiting trial, who Ingram claims would have testified that his disciplinary record while incarcerated was excellent. He contends that this information, especially when paired with the fact that he had no violent criminal history, would have shown that he would be a good inmate and would not have posed a safety risk if sentenced to life imprisonment rather than death.

---

[11]   Ingram exhausted this claim in the state courts. He raised this claim in his petition for certiorari to the Alabama Supreme Court (Vol. 42, Tab #R-109, at 29-50), but the Court denied certiorari. (*Ex parte Ingram*, Vol. 42, Tab #R-110.)

Ingram raised this claim for the first time in his Rule 32 proceedings, and the

ACCA denied relief on this claim, holding as follows:

> Ingram argues that trial counsel failed to investigate and to present evidence of his good behavior during his pretrial incarceration. At the evidentiary hearing, the State conceded that Ingram had a good disciplinary record while awaiting trial. Ingram asserts that evidence of prison adaptability is inherently mitigating and that there was no reasonable, strategic reason for failing to present it during the penalty phase.

> The circuit court acknowledged Judge Fannin's testimony that, to his recollection, Ingram did not get into trouble while incarcerated prior to trial. Yet, Ingram "did not ask [Judge Fannin] the reason they did not present such 'mitigating evidence' during the penalty phase of Ingram's trial. Thus, the record is silent as to the reasoning behind counsel's actions and '"'the presumption of effectiveness is sufficient to deny relief on [an] ineffective assistance of counsel claim.'"'" (R. 994-95; *quoting Broadnax v. State*, 130 So. 3d 1232, 1255-56 (Ala. Crim. App. 2013), *quoting in turn Dunaway v. State*, 198 So. 3d 530, 547 (Ala. Crim. App. 2009), *quoting in turn Howard v. State*, 239 S.W.3d 359, 367 (Tex. App. 2007)). Further, "counsel is not required to present all mitigation evidence, even if the additional mitigation evidence would not have been incompatible with counsel's strategy. Counsel must be permitted to weed out some arguments to stress others and advocate effectively." *McWhorter v. State*, 142 So. 3d 1195, 1246 (Ala. Crim. App. 2011) (citations and quotations omitted). The circuit court also found that such evidence was minimally mitigating and would have called attention to the fact that Ingram was incarcerated while awaiting trial. (R. 995.)

(Vol. 41, Tab #R-107, at 25.)

To meet his 28 U.S.C. § 2254(d)(1)-(2) burden, Ingram argues that the ACCA's[12] rejection of the claim was contrary to, or involved an unreasonable application of, *Skipper v. South Carolina*, 476 U.S. 1 (1986), which Ingram argues stands for the proposition that evidence of a capital defendant's adaptability to prison is a powerful factor in mitigation of punishment. However, just because *Skipper* made clear that a prisoner's good behavior in prison may be relevant to mitigation, *Skipper* did not clearly establish that defense counsel is automatically constitutionally ineffective by failing to present such evidence at the penalty phase.

The ACCA reasonably denied relief on this claim based on the Rule 32 court's finding that the record was silent concerning trial counsel's actions because post-conviction counsel did not question counsel concerning his reason for not presenting this evidence, because counsel is not required to present all mitigating evidence, and because this evidence was "minimally mitigating." Ingram has failed to show otherwise, and accordingly, this sub-claim is due to be dismissed.

### 2.   Sub-claim (4): alleged failure to present evidence of possible neurotoxin exposure as a child

The Court now turns to Ingram's fourth sub-claim, that his defense counsel failed to investigate and present evidence concerning the possibility that Ingram

---

[12]    Ingram exhausted this claim in the state courts. He raised this claim in his petition for certiorari to the Alabama Supreme Court (Vol. 42, Tab #R-109, at 29-50), but the Court denied certiorari. (*Ex parte Ingram*, Vol. 42, Tab #R-110.)

suffered neurological and psychiatric impairments due to the probability that he was exposed to lead and PCBs both in utero and during childhood. More specifically, Ingram contends that, if his defense counsel had investigated, they would have uncovered that Ingram was raised for part of his childhood in the housing projects in Anniston, Alabama, where other children have been shown to have suffered from lead poisoning, which is known to cause brain damage and other psychiatric disorders. He further states that he swam in creeks and ponds as a child in Anniston, which were contaminated by PCBs because of intentional environmental pollution by various chemical companies, including Monsanto. Ingram states that exposure to PCBs can cause learning difficulties, developmental delays, behavioral problems, memory deficits, and low I.Q. He contends that his brother and sister tested positive for PCB exposure and received settlements in an ongoing civil action against Monsanto. Finally, he contends that he was at a higher risk than other children to have deficits related to PCB exposure because his mother had an eating disorder ("pica"), and ingested clay from areas polluted by PCBs, while she was pregnant with him. Ingram points out that in utero exposure to PCBs is especially harmful to brain development. Ingram says that such evidence of these probable mental and neurological impairments, had it been presented at the penalty phase, would have cast his culpability in a different and much less aggravated light and spared his life.

In his Rule 32 proceedings, Ingram raised for the first time the claim that his defense counsel were ineffective for failing to investigate and present evidence that Ingram "suffered from low cognitive functioning and neurological impairments (i.e., brain damage) most likely resulting from exposure to lead, PCBs or other neurotoxins." (Vol. 29, Tab #R-97, C. 907, at 986.) Several times, he sought funds for an expert to prove this claim, but the State opposed the requests, and the circuit court denied them.

Prior to the evidentiary hearing, which was to be held on April 3-4, 2013, Ingram secured as *pro bono* experts two individuals who were not mental health experts and who had never met or evaluated Ingram, but whose expertise centered around neurotoxin exposure as mitigation evidence in capital cases and the relationship between exposure to lead poisoning and criminal behavior. Prior to the hearing, Ingram listed these individuals as expert witnesses. In response to that notification, the State moved to have Ingram examined by a mental health expert contracted by the State, in order to rebut any possible mental health testimony Ingram intended to offer through his experts at the hearing. The circuit court granted the State's motion.

Ingram challenged the ruling, asking the ACCA for a writ of mandamus directing the circuit judge to vacate its order and to stay the evidentiary hearing. The

ACCA denied the mandamus petition. (Vol. 43, Tab #R-112.) Ingram then filed an emergency petition requesting the same relief from the Alabama Supreme Court. The Alabama Supreme Court denied the petition on the morning of the hearing. (Vol. 44, Tab #R-114.)

The hearing was held on April 3-4, 2013. On the first morning of the hearing, Ingram's counsel reiterated to the circuit court that, on their advice, Ingram would not cooperate with any mental health examination by an expert contracted for by the State. The circuit court then ruled that Ingram would not be able to call his two experts at the hearing or put on evidence related to Ingram's mental health as it related to PCBs and lead.

After the hearing, the circuit court rejected the ineffective assistance of counsel claim for two reasons. First, it found that it was insufficiently pleaded insofar as Ingram did not allege that he does in fact suffer from being poisoned by either lead or PCBs; rather he alleged only that it was possible that he was exposed to such substances. (Vol. 29, Tab #R-97, C. 907, at 987-88.) The circuit court noted that at the onset of the Rule 32 evidentiary hearing, Ingram's post-conviction counsel had confirmed the "speculative nature of this allegation and conceded that Ingram has never been tested for exposure to these substances." (*Id.*) Second, the circuit court

held that Ingram voluntarily waived relief on this claim when he refused to make

himself available to the State for a mental evaluation. (*Id.* at 987-93.)

On appeal, the ACCA affirmed, discussing in detail the facts surrounding this

claim and the circuit court's ruling, as follows:

> Ingram argues the circuit court erred in finding that he waived
> his claim that trial counsel were ineffective for failing to investigate and
> to present evidence that he suffered from neurological impairments as
> a result of exposure as a child to lead and PCBs. Ingram asserts that he
> did not waive this claim, but "had it stripped from him by the circuit
> court as a sanction for refusing to submit to an unlawful State-
> sponsored mental health evaluation." (Ingram's brief, at 55.)

> According to Ingram, "it was clear that development of the most
> important, probative and persuasive evidence in support of his claim[s]
> would require assistance from experts in other disciplines, i.e.,
> individuals with advanced professional training and experience in, e.g.,
> psychiatry, neuropsychology, and/or neurology." (Ingram's brief, at
> 55.) Thus, Ingram moved on several occasions for funds for expert
> assistance. Ingram's motions were denied. Nevertheless, Ingram was
> able to obtain the assistance of two experts, both of whom offered their
> services pro bono.

> One month prior to Ingram's scheduled evidentiary hearing, he
> submitted to the circuit court a witness list and an updated exhibit list.
> The witness list identified his two expert witnesses -- Russell Stetler
> and Dr. Deborah Denno. (Mandamus, Attachment 12.) Among the
> exhibits were maps of Ingram's childhood residences and a local
> chemical plant, and affidavits from Stetler and Dr. Denno. (Mandamus,
> Attachment 13.) Stetler's affidavit indicated that he intended to offer
> evidence regarding the prevailing standards of a mitigation
> investigation at the time of Ingram's trial. The affidavit included
> Stetler's opinions regarding the standard of care in capital mental-
> health evaluations and a trial counsel's duty to investigate potential
> exposure to lead and other neurotoxins in 1995. Dr. Denno's affidavit

indicated that she intended to present evidence regarding the cognitive and behavioral effects of early exposure to lead.

The State, in turn, moved the circuit court to grant the State's mental-health expert access to Ingram to prepare for and possibly rebut any mental-health testimony offered by Ingram's experts at the upcoming hearing. (Mandamus, Attachment 1.) Ingram objected to the State's motion, arguing that there was no provision under Rule 32, Ala. R. Crim. P., for the State to demand access, and that granting access might compromise Ingram's constitutional rights to silence, to counsel, and to a reliable review of his death sentence. (Mandamus, Attachment 2.) Additionally, Ingram argued that there was no need for rebuttal evidence because Ingram had never been granted funds for an expert evaluation of his own and neither of his experts had conducted an evaluation or intended to offer evidence regarding his competency to stand trial, his mental state at the time of the offense, or his present mental state. The circuit court granted the State's motion. (Mandamus, Attachment 3.)

Ingram filed a petition for a writ of mandamus with this Court, asking this Court to direct the circuit court to vacate its order granting the State access to him. On March 27, 2014, this Court denied Ingram's petition. *Ex parte Ingram*, CR-13-0898. Ingram then sought relief from the Alabama Supreme Court. On April 3, 2014, the Alabama Supreme Court likewise denied Ingram's petition. *Ex parte Ingram*, No. 1130691.

At the beginning of the evidentiary hearing, the State informed the circuit court that Ingram had "refused to cooperate with our expert at the time under advice of counsel." (R. 7.) The State moved "to exclude all of the claims that concern mental health." (R. 8.) Rule 32 counsel acknowledged that he had advised Ingram to be non-compliant. The circuit court ruled that, due to Ingram's refusal to cooperate, he would be precluded from presenting any evidence "that would involve mental impairment." (R. 13.)

On appeal, Ingram challenges the circuit court's finding that he waived his claim that trial counsel were ineffective for failing to investigate and to present evidence that he suffered from neurological

impairments as a result of exposure as a child to lead and PCBs. In
support of his claim regarding the finding of waiver, he argues that the
circuit court erred by granting the State's motion for access to him and
by excluding his evidence at the evidentiary hearing. Yet, waiver was an
alternative holding; the circuit court also dismissed this particular claim
because it was insufficiently pleaded in Ingram's petition. (C. 987.)
Because this claim was insufficiently pleaded, Ingram was not entitled
to an opportunity to present evidence in support of it. *See Boyd*, 913 So.
2d at 1125 ("After facts are pleaded, which, if true, entitle the petitioner
to relief, the petitioner is then entitled to an opportunity, as provided in
Rule 32.9, Ala. R. Crim. P., to present evidence proving those alleged
facts." (some emphasis added)). Thus, there was no error in the circuit
court's preventing Ingram from presenting evidence in support of this
insufficiently pleaded claim.

Moreover, Ingram has not challenged the circuit court's finding
that this specific claim was insufficiently pleaded. This Court has held
that the failure to challenge an alternative holding results in a waiver of
the issue on appeal. *See Jackson v. State*, 127 So. 3d 1251, 1255-56 (Ala.
Crim. App. 2010), and the cases cited therein. As such, Ingram has
waived on appeal his claim that trial counsel were ineffective for failing
to investigate and to present evidence that he suffered from
neurological impairments as a result of exposure as a child to lead and
PCBs.

(Vol. 41, Tab #R-107, at 35-38.)

Respondent argues that this sub-claim is not fully exhausted because Ingram

waived the claim by refusing to subject himself to examination by the State's mental

health expert during the Rule 32 proceedings. (Doc. 36 at 15-16.) The Court agrees.

Ingram's opportunity to prove that his trial defense counsel were constitutionally

ineffective in failing to present mitigation evidence of mental impairments due to

exposure to PCBs and lead occurred at his Rule 32 evidentiary hearing but, on the

advice of his counsel, Ingram refused to allow himself to be examined by a mental health expert contracted by the State. The State requested that he be examined so that it could rebut any mental health evidence and testimony Ingram intended to offer at the hearing. The circuit court ruled that Ingram could not present evidence on this issue at the hearing because he refused to be examined. Ingram challenges the circuit court's decision as a due process violation in Claim K of his federal habeas petition, *see* IV.K., *infra*, but for present purposes, the circuit court held that Ingram's refusal to be examined operated as a waiver of his ineffective assistance of counsel claim insofar as it related to alleged failure to present evidence related to PCBs.

Whether the claim is actually procedurally defaulted from this Court's review, however, is a closer question. As noted, the circuit court also ruled that Ingram failed to sufficiently plead the claim because he admittedly never pled that he does in fact suffer from exposure to PCBs and lead poisoning. Ingram could have argued on appeal to the ACCA that the circuit court erred in alternatively holding that he failed to sufficiently plead the claim, but he did not. Instead, he argued solely that the circuit court erred in finding that he waived the claim by refusing to submit to a mental health examination by the State. Despite Ingram's failure to challenge the pleading-insufficiency ruling on appeal, the ACCA nonetheless appears to have

considered it and used it as an alternative reason for affirming the circuit court. (*See* Vol. 41, Tab #R-107, at 38 ("Because this claim was insufficiently pleaded, Ingram was not entitled to an opportunity to present evidence in support of it. . . . Thus, there was no error in the circuit court's preventing Ingram from presenting evidence in support of this insufficiently pleaded claim.").) And, a Rule 32 dismissal for failure to plead a claim with sufficient specificity is a merits ruling in this circuit, to which the 28 U.S.C. § 2254(d) presumption attaches. *Borden v. Allen*, 646 F.3d 785, 812-13 (11th Cir. 2011). For a claim to be procedurally defaulted and unreviewable by this Court, the last state court to render a judgment on the claim must rely solely on state procedural rules to resolve the claim, without reaching the merits of the claim. *Ward*, 592 F.3d at 1156-57. The Court is not convinced that this is what happened here, because the ACCA relied not only on state procedural rules—i.e., the circuit court's ruling that Ingram abandoned the claim—in resolving the claim, but it also appears to have relied on Ingram's failure to plead the claim sufficiently.

In an abundance of caution, then, the Court notes that, assuming that this claim is not procedurally defaulted and is in fact due to be considered pursuant to 28 U.S.C. § 2254(d), Ingram has not established that the ACCA's rejection of the claim is contrary to, or an unreasonable application of, Supreme Court precedent, or based upon an unreasonable determination of the facts. In short, Ingram bore the burden

of proving that he was denied ineffective assistance of counsel based on the allegations in his Rule 32 petition. But he never even alleged that he actually was exposed to lead and PCBs in childhood. Thus, as the ACCA determined, Ingram could not establish that he was prejudiced as required by *Strickland* by his defense counsel's failure to investigate whether he suffered from a mental impairment due to such exposure.

In sum, this ineffective assistance of counsel claim fails either because (1) it is procedurally defaulted from this Court's review or (2) because Ingram has failed to establish that the ACCA's rejection of the claim meets one of the exceptions to the deference this Court must afford it based upon 28 U.S.C. § 2254(d).

### 3.    Sub-claim (5): alleged failure to object to statements made by the prosecution in closing arguments in both the guilt and penalty phases of trial

Ingram's final sub-claim is that his defense counsel were constitutionally ineffective in failing to object when the prosecutor stated during closing arguments at the penalty phase that capital punishment is "society's right of self-defense." (Vol. 6, Tab #R-22, TR. 1020, at 1026.) Ingram also contends that defense counsel should have objected during the prosecutor's argument at the guilt phase of the trial, when he stated:

> [This case] is about why areas in this state and this nation – that people do not feel safe. That people do not feel protected and do not feel

secure. You know, law and order, a term often used – law is simply rules that citizens place upon themselves to govern their conduct; and order is what we are trying to preserve. But there are areas in our state and in our nation where law does not prevail, but lawlessness prevails. Where people like Greg Huguley, the less fortunate people in this world, are told to be kept in line because if they don't they used to be beat up. Then there was cutting. Then they were shot. Then there was drive-by shootings. The great American tragedy of drugs and violence.

(Vol. 6, Tab #R-14, TR. 864, at 900-01.)

According to Ingram, these statements violated his right to a fundamentally fair trial and sentencing proceeding guaranteed by the Due Process Clause of the Fourteenth Amendment because they injected extraneous and arbitrary matters in the jury's deliberations, effectively asking the jury to sentence Ingram to death to strike a blow against the "war on drugs."

With regard to the part of this sub-claim pertaining to counsel's failure to object during the penalty phase of the trial, Ingram raised this claim for the first time during his Rule 32 proceedings, and the circuit court ruled as follows with regard to it:

> In paragraph 36 of his Fifth Amended Rule 32 Petition, Ingram alleged that his trial counsel were ineffective because his trial counsel "failed to object to improper summation comments by the prosecutor, including argument that capital punishment is 'self-defense.'" (Ingram's Fifth Amended Rule 32 Petition, p. 30.) Ingram, however, presented no evidence at the evidentiary hearing to prove this claim.

> Indeed, although one of his trial counsel testified at the evidentiary hearing, Ingram neither asked him about the allegedly

improper comments from the State, nor did he ask him why he did not raise an objection to the allegedly improper comments. Because Ingram failed to put forth any evidence as to either the allegedly improper arguments or trial counsels' reasoning for not objecting to that argument, the record is silent as to this claim. Thus, this Court finds that Ingram failed to satisfy his burden of proof as to this specific allegation.

Regardless, the premise underlying Ingram's claim of ineffective assistance of counsel—that the State's capital punishment-as-self-defense argument was improper—was specifically addressed by the Alabama Court of Criminal Appeals in its opinion affirming Ingram's conviction and sentence and held to be a proper argument. Indeed, after quoting the State's allegedly improper argument and placing it in context of the entire proceeding, the Court of Criminal Appeals held:

> The prosecutor's remarks in his closing argument to the jury in the guilt phase and in the sentencing phase, which we have set out above, were clearly a general appeal for law enforcement when viewed in context of his entire argument. They were well within the latitude allowed prosecutors in making such arguments; they were not improper.

*Ingram I*, 779 So. 2d at 1269. "'An attorney's failure to raise a meritless argument . . . cannot form the basis of a successful ineffective assistance of counsel claim because the result of the proceeding would not have been different had the attorney raised the issue.'" *Hooks v. State*, 21 So. 3d 772, 785 (Ala. Crim. App. 2008) (quoting *United States v. Kimier*, 167 F.3d 889, 893 (5th Cir. 1999)). Thus, this claim is denied.

(Vol. 29, Tab R#-97, C. 907, at 90-92.) Ingram failed to exhaust this claim in the state courts, because he did not raise it on appeal to the ACCA or to the Alabama Supreme Court from the denial of Rule 32 relief by the circuit court. He thus did not

give the state courts a full and fair opportunity to decide this claim, which includes giving the "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate process." *O'Sullivan*, 526 U.S. at 842-45. Ingram abandoned the claim at the appellate level in his post-conviction proceedings, and thus, he has not exhausted the claim in the state courts. Ingram would be barred from attempting to raise the claim now in state court under Rule 32.2(c), Ala. R. Crim. P. (statute of limitations bar) and under Rule 32.2(b), Ala. R. Crim. P. (successive petition bar). Thus, because any state remedy with respect to the claim is procedurally barred by the state procedural rules, the claim is procedurally defaulted from this Court's review. *See Collier*, 910 F.2d at 772. Further, Ingram has made no attempt to excuse the procedural default.

With regard to the part of this sub-claim pertaining to counsel's failure to object during the guilt phase of the trial, it is contradicted by the record and procedurally defaulted. Ingram's defense counsel did object to these statements made by the prosecutor in closing argument, arguing that they were "improper" and that "I don't recall any testimony about cutting, shooting, or drive by's or anything of that nature." (Vol. 6, Tab #R-14, TR. 864, at 901.) The court overruled the objection. (*Id.*) Moreover, Ingram raised this claim for the first time in his Rule 32 proceedings, but he waived the claim during the evidentiary hearing, along with all

of his other guilt-phase-ineffective-assistance claims. (*See* Vol. 29, Tab #R-97, C. 907, at 90 n.16.) For the reasons explained in part IV.D., *supra*, this claim was not exhausted in the state courts and is thus procedurally defaulted. Ingram has made no attempt to excuse the default of this claim, and thus, this Court may not consider it.

### F.   Ingram's claim that he was denied the effective assistance of appellate counsel on direct appeal

The Alabama Supreme Court affirmed Ingram's conviction and sentence on direct appeal on June 23, 2000. Three days later, the United States Supreme Court decided *Apprendi v. New Jersey*, holding that when a fact (other than a prior conviction) increases a sentence beyond the maximum authorized statutory sentence, such fact must be submitted to a jury and proven beyond a reasonable doubt. 530 U.S. 466, 490 (2000). Ingram claims that his appellate counsel were constitutionally ineffective for failing to seek rehearing of the Alabama Supreme Court's decision within the 14-day rehearing window, on the ground that his sentence violated *Apprendi*.

Ingram raised this claim in his Rule 32 petition and on appeal to the ACCA from the circuit court's denial of post-conviction relief. The ACCA affirmed the denial of relief on this claim, as follows:

> Ingram's claim is, in effect, a claim that appellate counsel were ineffective for failing to raise an *Apprendi* claim. Judge Fannin, who also served as appellate counsel, was asked at the evidentiary hearing

> whether he had considered raising an issue on appeal based on *Apprendi*. Judge Fannin answered, "I can't recall. I don't remember that, and I don't even know if we had known about that ruling in *Apprendi* at that time. I just can't remember." (R. 63-64.)
>
> *Apprendi* was decided by the Supreme Court of the United States on June 26, 2000 -- three days after the Alabama Supreme Court affirmed Ingram's conviction and sentence. "The well-settled rule of [the Alabama Supreme] Court precludes consideration of arguments made for the first time on rehearing." *Water Works and Sewer Bd. of City of Selma v. Randolph*, 833 So. 2d 604 (Ala. 2002) (citing *Ex parte Lovejoy*, 790 So. 2d 933, 938–39 (Ala. 2000)). Consequently, if appellate counsel had raised this claim in his brief on rehearing, it would not have been considered. And, as discussed herein, the claim would have been without merit even if it had been raised. Appellate counsel cannot be held ineffective for failing to raise a meritless claim. *See Jackson v. State*, 133 So. 3d 420, 453 (Ala. Crim. App. 2009) ("'[B]ecause the underlying claims have no merit, the fact that Magwood's lawyer did not raise those claims cannot have resulted in any prejudice to Magwood.'" (quoting *Magwood v. State*, 689 So. 2d 959, 974 (Ala. Crim. App. 1996))).

(Vol. 41, Tab #R-107, at 39-41.) In the section of the ACCA's opinion immediately preceding the above-quoted section, the ACCA had considered and rejected a substantive claim that Ingram had raised that his sentence violated *Apprendi*, reasoning as follows:

> Ingram argues that the circuit court erred in denying his claim that he was denied his right to have a jury determine the facts increasing the prescribed range of penalties to which he was exposed. Ingram asserts that because Alabama's capital-sentencing scheme allows for the trial court to weigh the aggravating and mitigating factors and to impose a sentence of life or death, the scheme violates the holdings of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), *Ring v. Arizona*, 536 U.S. 584 (2002), and *Hurst v. Florida*, 136 S. Ct. 616 (2016). The circuit court

dismissed this claim as being insufficiently pleaded and without merit. (C. 292-93.)

In *Ex parte Bohannon*, 222 So. 3d 525 (Ala. 2016), the Alabama Supreme Court held that Alabama's capital-sentencing scheme was consistent with the holdings of *Apprendi*, *Ring*, and *Hurst*:

> "As previously recognized, *Apprendi* holds that any fact that elevates a defendant's sentence above the range established by a jury's verdict must be determined by the jury. *Ring* holds that the Sixth Amendment right to a jury trial requires that a jury 'find an aggravating circumstance necessary for imposition of the death penalty.' *Ring*, 536 U.S. at 585. *Hurst* applies *Ring* and reiterates that a jury, not a judge, must find the existence of an aggravating factor to make a defendant death-eligible. *Ring* and *Hurst* require only that the jury find the existence of the aggravating factor that makes a defendant eligible for the death penalty -- the plain language in those cases requires nothing more and nothing less. Accordingly, because in Alabama a jury, not the judge, determines by a unanimous verdict the critical finding that an aggravating circumstance exists beyond a reasonable doubt to make a defendant death-eligible, Alabama's capital-sentencing scheme does not violate the Sixth Amendment."

*Bohannon*, 222 So. 3d at 532.

The Alabama Supreme Court has considered and rejected Ingram's claim. *See id.; see also Wimbley v. State*, 238 So. 3d 1268 (Ala. Crim. App. 2016). The circuit court did not err in dismissing this claim. *See* Rule 32.7(d), Ala. R. Crim. P. As such, this claim does not entitle Ingram to any relief.

(Vol. 41, Tab #R-107, at 38-39.)

Because the ACCA decided this claim on the merits, pursuant to 28 U.S.C. § 2254(d)(1)-(2), Ingram's task is to establish that the ACCA's rejection of the claim[13] was either an unreasonable determination of the facts in light of the evidence presented in the state court proceeding or was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. Ingram has not attempted to do either.

Regardless, the ACCA properly held that Ingram was not entitled to relief on this ineffective assistance of appellate counsel claim. As the ACCA noted, *Apprendi* was not decided until after the Alabama Supreme Court affirmed Ingram's conviction and death sentence, and Ingram could not raise this new argument in an application for rehearing. Moreover, as the ACCA also found, Ingram has failed to prove that he was prejudiced by counsel's failure because the claim is meritless.

Based on the foregoing, this claim is due to be dismissed.

**G.    Ingram's claim that he was denied his sixth amendment right to a trial by jury because the trial court, and not the jury, determined the facts necessary to impose a death penalty**

This is Ingram's substantive *Apprendi* claim. As noted in the previous section, Ingram raised this claim for the first time in his Rule 32 proceedings, and the

---

[13]    Ingram exhausted this claim in the state courts. He raised this claim in his petition for certiorari to the Alabama Supreme Court (Vol. 42, Tab #R-109, at 68-74), but the Court denied certiorari. (*Ex parte Ingram*, Vol. 42, Tab #R-110.)

circuit court denied it, followed by the ACCA. (Vol. 41, Tab #R-107, at 38-39.) The ACCA found that the circuit court properly denied relief because the Alabama courts had considered and rejected the same claim.

Ingram has not shown that the decision by the ACCA[14] "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or that the State court's determination of this issue "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." 28 U.S.C. § 2254(d)(1)-(2).

*Ring* holds that a jury must find the existence of the facts that increase the range of punishment to include the imposition of the death penalty. In *Ring*, the Supreme Court applied the rule of *Apprendi* to death penalty cases. In so doing, it overruled part of *Walton v. Arizona*, 497 U.S. 639 (1990). The Court held that Arizona's death penalty statute violated the Sixth Amendment right to a jury trial "to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." *Ring*, 536 U.S. at 585. Thus, a trial court cannot make a finding of "any fact on which the

---

[14]    *See* note 13, *supra*.

legislature conditions an increase in their maximum punishment." *Id*. at 589. Only the jury can.

As long as the jury finds the existence of at least one aggravating factor at the guilt phase, both the Supreme Court of Alabama and the Eleventh Circuit Court of Appeals have held that a resulting death sentence complies with *Ring*. In *Ex parte Waldrop*, 859 So. 2d 1181 (Ala. 2002), the Supreme Court of Alabama addressed the effect of *Ring* on the constitutionality of Alabama's sentencing scheme. There, the defendant had been convicted of two counts of murder during the course of a robbery in the first degree, in violation of Ala. Code § 13A-5-40(a)(2) (1975). *Id*. at 1188. The Supreme Court of Alabama explained that "[b]ecause the jury convicted Waldrop of two counts of murder during a robbery in the first degree . . . the statutory aggravating circumstance of committing a capital offense while engaged in the commission of a robbery, Ala. Code 1975, § 13A-5-49(4), was 'proven beyond a reasonable doubt.'" *Id*. (citing Ala. Code § 13A-5-45(e); Ala Code § 13A-5-45(f)). The Court explained that "[o]nly one aggravating circumstance must exist in order to impose a sentence of death." *Id*. (citing Ala. Code § 13A-5-45(f)). Because "the findings reflected in the jury's verdict alone exposed Waldrop to a range of punishment that had as its maximum the death penalty," the State had done "all *Ring* and *Apprendi* require."

*Id*. The Eleventh Circuit agreed with this reasoning in *Lee v. Commissioner, Alabama Department of Corrections*, 726 F.3d 1172, 1197-98 (11th Cir. 2013).

Ingram was found guilty of murder during the course of a kidnapping in violation of Ala. Code § 13A-5-40(a)(1). The jury then necessarily found beyond a reasonable doubt the existence of the corresponding aggravating circumstance specified in Ala. Code § 13A-5-49(4). This finding by the jury exposed Ingram to a range of punishment that has as its maximum the death penalty. That is all that *Ring* requires.

Accordingly, because Ingram is not entitled to relief on his *Apprendi/Ring* claim, fairminded jurists could not disagree that the ACCA's rejection of the claim was reasonable, and this Court must defer to the state courts' decision.

**H.    Ingram's claim that the repeated references to the sentencing phase verdict as a "recommendation" violated his rights under the Sixth and Eighth Amendments**

Ingram claims that the trial court repeatedly referred to the jury's sentencing phase verdict as a "recommendation;" that this repetition led the jury to believe that its decision would not be a determining factor in sentencing Ingram to death; and that this diminution of the jury's sense of responsibility for its role in sentencing contradicted the Eighth Amendment rule recognized in *Caldwell v. Mississippi*, 472 U.S. 320 (1985), and reaffirmed in *Romano v. Oklahoma*, 512 U.S. 1 (1994).

As Ingram acknowledges, he did not object to the trial court's use of the term "recommendation" during the sentencing phase of the trial. He did raise the argument on direct appeal, and the ACCA denied relief on this claim, holding as follows:

> Ingram contends that references in the trial court's oral charge to the jury in the sentencing phase to the jury's verdict being a recommendation diminished the importance of the jury's role in his sentencing to such an extent that it violated the rule of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985). He points to several instances in the trial court's oral charge where the court used the word "recommendation" when referring to the jury's verdict. He argues that this, in effect, "told the jury that its decision would not be a determining factor in sentencing Mr. Ingram to death." (Appellant's brief, p. 55.) He relies on *Ex parte Williams*, 556 So. 2d 744 (Ala. 1987), cert. denied, 500 U.S. 938, 111 S. Ct. 2067, 114 L. Ed. 2d 471 (1991), and *Mann v. Dugger*, 844 F.2d 1446 (11th Cir. 1988), to support his contention. He did not object to the trial court's instruction to the jury in this regard during the trial of the case.
>
> *Caldwell v. Mississippi* held that it is constitutionally impermissible to rest a death sentence on a determination by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death sentence rests elsewhere. However, it is not error for the trial court to accurately instruct the jury as to its role in the sentencing process. *See, e.g., Ex parte Hays*, 518 So. 2d 768 (Ala. 1986), cert. denied, 485 U.S. 929, 108 S. Ct. 1099, 99 L. Ed. 2d 262 (1988); *Williams v. State*. Comments that accurately explain the respective functions of the judge and jury are permissible under *Caldwell* so long as the significance of the jury's recommendation is adequately stressed. *Harich v. Wainwright*, 813 F.2d 1082 (11th Cir. 1987); *Price v. State*, 725 So. 2d 1003 (Ala. Crim. App. 1997). When a trial court informs a jury that its verdict is advisory or is only a recommendation and that the trial court makes the final decision concerning sentencing, there is no automatic violation of the rule of

*Caldwell v. Mississippi. Kuenzel v. State*; *White v. State*, 587 So. 2d 1218 (Ala. Crim. App. 1990), aff'd, 587 So. 2d 1236 (Ala. 1991); *Martin v. State*.

In the present case, we do not agree with Ingram's characterizations of the trial court's use of the word "recommendation" in referring to the jury's verdict in the sentencing phase as having the effect of telling the jury that its decision would not be a determining factor. We find, after reviewing the entire charge, that it was a correct statement of the law; that it accurately informed the jury of its sentencing authority; that there is no reasonable possibility that the jury was misled, misinformed, or confused as to its critical role in sentencing; and that the charge in no way minimized the jury's role and responsibility in sentencing. We find no violation of *Caldwell v. Mississippi*, as Ingram contends. The cases of *Ex parte Williams* and *Mann v. Dugger*, relied upon by Ingram, are factually distinguishable from the instant case.

*Ingram*, 779 So. 2d at 1276.

Because the ACCA[15] decided this claim on the merits, Ingram invokes 28 U.S.C. § 2254(d)(1) by arguing that the ACCA's decision was contrary to *Caldwell* and *Romano*, *supra*.

In *Caldwell*, the Supreme Court ruled in a partially-divided opinion that the Eighth Amendment is violated when a jury is "led to believe that responsibility for determining the appropriateness of a death sentence rests not with the jury but with

---

[15]     Ingram raised this claim in his petition for certiorari to the Alabama Supreme Court, but that Court affirmed the ACCA's judgment without specific discussion of this claim. *See Ex parte Ingram*, 779 So. 2d at 1285. Because the Alabama Supreme Court affirmed the ACCA's judgment without discussion of this claim, the Court looks to the ACCA's analysis. *See Wilson*, 138 S. Ct. at 1192, *supra*, note 7.

the appellate court which later reviews the case." 472 U.S. at 323. *Caldwell* involved a death sentence in Mississippi, where the jury had the sole responsibility for imposing the sentence, and appellate courts reviewed the sentence with a "presumption of correctness." *See id.* at 331–32. The *Caldwell* prosecutor told the jury unequivocally to absolve themselves of any belief that they would be responsible for killing the defendant because their decision was reviewable. *Id.* at 325.

Because only four Justices joined part of the majority's analysis in *Caldwell*, the Supreme Court later adopted Justice O'Connor's *Caldwell* concurrence as limiting the case's reach, holding:

> *Caldwell* [is] relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision. Thus, [t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.

*Romano*, 512 U.S. at 9 (citations and quotation marks omitted).

As noted by the ACCA, *Caldwell* is distinguishable from the facts of this case. Unlike the sentencing scheme in Mississippi, Alabama's sentencing scheme treats the jury's verdict as advisory. The Court has reviewed the trial court's sentencing-phase jury instructions in this case, and they accurately described the jury's advisory role in Alabama's capital sentencing scheme. *See Harich v. Dugger*, 844 F.2d 1464, 1473 (11th Cir. 1988)(holding that informing jury of its "advisory" function does not

violate *Caldwell*); *see also Davis v. Singletary*, 119 F.3d 1471, 1482 (11th Cir. 1997) (in a case where the jury instructions contained "references to and descriptions of the jury's sentencing verdict . . . as an advisory one, as a recommendation to the judge, and of the judge as the final sentencing authority," holding that such comments "accurately characterize the jury's and judge's sentencing roles under Florida law" and so "are not error under *Caldwell*").

Having reviewed the record, the Court finds that it was reasonable for the ACCA to have found that the trial court did not misrepresent the law regarding the jury's role. The remarks made, viewed in context, accurately portrayed the relationship between the judge and jury and did not denigrate the jury's role in the proceedings. As such, Ingram has failed to sustain his burden of proof.  He has not shown that the decision by the ACCA "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. §2254(d)(1). Federal habeas relief is therefore foreclosed.

I.     **Ingram's claim that the use of the heinous, atrocious and cruel aggravator in jury and judicial sentencing violated his rights under the Eighth and Fourteenth Amendments**

Ingram contends that the trial court instructed the jury on the "heinous, atrocious and cruel" ("HAC") aggravating circumstance under Alabama law in an

unconstitutionally vague manner. Specifically, he argues that the court's instruction that the jury compare his offense to other capital offenses in making a determination whether the HAC aggravator had been proven beyond a reasonable doubt violated his constitutional rights because the jury was not familiar with other capital cases and was not provided with any information about other capital cases with which to perform the comparison.

The jury was instructed as follows about the HAC aggravator:

Now the other aggravating circumstance you may consider is number eight on that list of eight, and that is that the capital offense was especially heinous, atrocious or cruel compared to other capital offenses.

The term heinous means extremely wicked or shockingly evil. The term atrocious means outrageously wicked and violent. The term cruel means designed to inflict a high degree of pain with utter indifference to or even enjoyment of the suffering of others.

What is intended to be included in this aggravating circumstance is those cases where the actual commission of a capital offense is accompanied by such additional acts to set the crime apart from the norm of capital offenses. For a capital offense to be especially heinous or atrocious, any brutality which is involved must exceed that which is normally present in any capital offense. For a capital offense to be especially cruel, it must be a conscienceless or pitiless crime, which is unnecessary torture to the victim.

All capital offenses are heinous, atrocious and cruel to sone extent. What is intended to be covered by this aggravating circumstance is only those cases which in the degree of heinousness, atrociousness or cruelty exceed that which will always exist when a capital offense is committed.

(Vol. 6, Tab #R-22, TR. 1020, at 1032-33.)

Ingram raised the general argument that the HAC aggravator was unconstitutionally vague for the first time on direct appeal, and the ACCA addressed this claim as follows:

> To the extent that Ingram is claiming that the "especially heinous, atrocious or cruel" statutory aggravating circumstance found in § 13A–5–49(8), is unconstitutionally vague and overbroad on its face, that contention is without merit. *See Freeman v. State*, 776 So. 2d 160 (Ala. Crim. App. 1999); *Bui v. State*, 551 So. 2d 1094 (Ala. Crim. App. 1988), aff'd, 551 So. 2d 1125 (Ala. 1989), judgment vacated on other grounds, 499 U.S. 971, 111 S. Ct. 1613, 113 L. Ed. 2d 712 (1991); *Hallford v. State*, 548 So. 2d 526 (Ala. Crim. App. 1988), aff'd, 548 So. 2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S. Ct. 354, 107 L. Ed. 2d 342 (1989).

> In comparing capital offenses for the purpose of determining whether a particular capital offense was "especially heinous, atrocious or cruel," we adhere to the standard announced in *Ex parte Kyzer*, 399 So. 2d 330, 334 (Ala. 1981)—the particular offense must be one of those "conscienceless or pitiless homicides which are unnecessarily torturous to the victim."

> In the instant case, the trial court correctly instructed the jury on the meaning of the aggravating circumstance set out in § 13A–5–49(8), in accordance with the *Kyzer* standard, as well as the burden of proof required of the state in proving aggravating circumstances, as follows:

>> "On the list of aggravating circumstances provided by law there are two circumstances that you may consider in this case if you are convinced beyond a reasonable doubt and to a moral certainty based on the evidence that each circumstance does exist. . . .

"....

"Whether any aggravating circumstance, which I instruct you on or define for you, has been proved beyond a reasonable doubt based on the evidence in this case, is for you the jury alone to determine . . .

"....

"Now the other aggravating circumstance you may consider is number eight on that list of eight, and that is that the capital offense was especially heinous, atrocious or cruel compared to other capital offenses.

"The term 'heinous' means extremely wicked or shockingly evil. The term 'atrocious' means outrageously wicked and violent. The term 'cruel' means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others.

"What is intended to be included in this aggravating circumstance is those cases where the actual commission of the capital offense is accompanied by such additional acts as to set this crime apart from the norm of capital offenses.

"For a capital offense to be especially heinous or atrocious, any brutality which is involved in it must exceed that which is normally present in any capital offense.

"For a capital offense to be especially cruel, it must be a conscienceless or pitiless crime which is unnecessarily torturous to the victim.

"All capital offenses are heinous, atrocious, and cruel to some extent. What is intended to be covered by this aggravating circumstance is only those cases in which the degree of heinousness, atrociousness, or cruelty exceed[s]

that which will always exist when a capital offense is committed.

"As I stated to you before, the burden of proof is on the state to convince each of you beyond a reasonable doubt as to the existence of any aggravating circumstance considered by you in determining what punishment is to be recommended in this case.

". . . .

"In deciding whether the state has proven beyond a reasonable doubt the existence of any given aggravating circumstance, you should bear in mind the definition I have given you relative to reasonable doubt."

(R. 1031–34.)

We note that we have previously approved of this instruction or instructions that were essentially the same pertaining to the aggravating circumstance of "especially heinous, atrocious or cruel" in a number of cases. *Freeman v. State*, and cases cited therein.

To the extent that Ingram is claiming that this statutory aggravating circumstance was unconstitutionally applied in his case, that contention is without merit. We find no merit in Ingram's contention that the trial court's instructions to the jury on this aggravating circumstance failed to properly channel and limit the jury's discretion. The trial court's findings, along with its instructions to the jury with regard to this aggravating circumstance, reflect a correct understanding of the aggravating circumstance, and the application of the law relating to it. The instructions were in accordance with the *Kyzer* standard, and were clear and understandable. *See Lindsey v. Thigpen*, 875 F.2d 1509 (11th Cir. 1989); *Ex parte Clark*, 728 So. 2d 1126 (Ala. 1998).

In determining the sentence to impose pursuant to § 13A–5–47, the trial court found the existence of the aggravating circumstance that

the capital offense was especially heinous, atrocious, or cruel when compared to other capital offenses. The trial court's findings in this regard are fully supported by the record, and we concur in them. We find no merit to Ingram's assertion that the trial court erred and violated his constitutional rights by the manner in which it found and applied the aggravating circumstance in this case. It is apparent that the trial court, in weighing the evidence presented, was guided by the *Kyzer* standard. We further find that the evidence was sufficient beyond a reasonable doubt to find the existence of this aggravating circumstance. Ingram's conduct was clearly conscienceless, pitiless, and unnecessarily torturous to the victim. Considering what the victim must have gone through in this case, it would be difficult to imagine a more painful, agonizing, prolonged, and torturous death. We find no merit in Ingram's contention, and certainly no plain error.

*Ingram*, 779 So. 2d at 1276-78.

However, Ingram never raised in any state court proceeding the specific argument that he raises here: that the portion of the HAC jury instruction requiring jurors to compare his offense to other capital offenses renders the instruction infirm. (*See* Vol. 9, Tab #R-26, at 57-58 (Ingram's appellant's brief on direct appeal).) Accordingly, this claim is not exhausted and procedurally defaulted. *O'Sullivan*, 526 U.S. at 842-45. Ingram would be barred from attempting to raise the claim now in state court because Alabama law prohibits collateral review of claims that could have been but were not raised at trial. Ala. R. Crim. P. 32.2(a)(3). Thus, because any state remedy with respect to the claim is procedurally barred by the state procedural rules, the claim is procedurally defaulted from this Court's review. *See Collier*, 910 F.2d at 772. Further, Ingram has made no attempt to excuse the procedural default, other

than to reiterate his earlier argument that Alabama does not provide a system of collateral review that allows for the effective consideration of claims.

Even if it were not procedurally defaulted, Ingram's claim would fail on the merits. As the ACCA found, the HAC aggravating circumstance is constitutional, the jury was properly instructed on this circumstance, and there is no doubt that the circumstance existed in this case—there is no doubt that the victim suffered unmercifully before his death where he was literally burned alive. For the foregoing reasons, this claim is due to be dismissed.

## J. Ingram's claim that the trial court violated his Eighth Amendment rights when it refused to give any weight to more than one statutory mitigation circumstance or any non-statutory mitigation circumstances

As noted previously, at the sentencing phase of Ingram's trial, several friends and relatives testified regarding his good character generally and positive acts, and each asked that he be sentenced to life without parole rather than death. (Vol. 6, Tab #R-20, TR. 944, at 945-1003.) Ingram claims that the trial judge, in his sentencing order, improperly refused to consider this evidence as a mitigating circumstance in violation of *Eddings v. Oklahoma*, 455 U.S. 104 (1982).

Ingram raised this claim for the first time on direct appeal, and the ACCA denied relief on this claim, writing the following:

Ingram contends that the trial court improperly failed to find the existence of any nonstatutory mitigating circumstances. He argues that he presented the testimony of his family and friends at the sentencing hearing before the jury, which testimony, he asserts, was "unquestionably mitigating." We have reviewed the record in this regard. It shows that he called eight witnesses to testify at his sentencing hearing before the judge and jury in an effort to establish mitigating circumstances.

His brother, Calvin Lavon Ingram, testified that he was nice and fun loving, that he cared about and got along with children, and that he could be a positive influence on the children. Felicia Stewart, a friend who had known him about 14 years, testified that he was quiet, never hostile, obeyed his mother, played basketball, got along well with the younger children, and never engaged in fights. Ms. Willie P. Taylor, his stepsister, stated that he was a good person, got along well with the children, and could have a positive influence on others. Mary Jones, a cousin, testified that she had known him all of his life, that he was close to her son, always had a positive attitude, was shy and kept to himself, and that he encouraged her son to stay out of trouble, get an education, and go to college. Anthony Parker, his brother-in-law, testified that he was the kind of person that would help you with problems, that he liked children and would play with them, and that Ingram had been a positive influence on Parker's life. Joyce Elston, his aunt, testified that occasionally during his life he had lived in her home, that he was real quiet, athletic, made good grades in school, and was a good influence on her children. Carla Parker, his sister, testified that he was a good, respectful young man, that when he was growing up he minded his mother and did everything he was supposed to do, that he had a young daughter and he was a good daddy, that he was athletic, made good grades in school, and was easy to get along with, that he had been an inspiration to her and her daughter and had helped them, and that he could be a positive influence on others if allowed to live. His mother, Dorothy Ackles, being ill and unable to attend court, testified by video deposition. She stated that he had two brothers and one sister, that he was her youngest child, that he was excellent in school, and made A's, B's, and C's, that he was involved in sports and had many trophies and ribbons, that he had a little girl who was one year of age, that he was

quiet and obedient, that he liked to work with children, that when he lived in New York he had summer jobs, and that when very young he had medical problems with his legs, but that those problems had been corrected. All of the witnesses asked that he be given a life sentence and that his life be spared. As we have previously mentioned, Ingram made a statement before the judge at sentencing, asking that his life be spared so he could be with his child and his family.

Ingram failed to object in the trial court to that court's sentencing order concerning its consideration and findings in reference to mitigating circumstances. Thus, we must review this issue under the plain-error rule.

"A sentencer in a capital case may not refuse to consider or be 'precluded from considering' mitigating factors." *Eddings v. Oklahoma*, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978)). The defendant in a capital case generally must be allowed to present any relevant mitigating evidence regarding the defendant's character or record and any of the circumstances of the offense, and consideration of that evidence is a constitutionally indispensable part of the process of inflicting the penalty of death. *California v. Brown*, 479 U.S. 538, 107 S. Ct. 837, 93 L.Ed.2d 934 (1987); *Ex parte Henderson*, 616 So. 2d 348 (Ala. 1992); *Haney v. State*, 603 So. 2d 368 (Ala. Cr. App. 1991), aff'd, 603 So.2d 412 (Ala. 1992), cert. denied, 507 U.S. 925, 113 S. Ct. 1297, 122 L. Ed. 2d 687 (1993); *Williams v. State*, 710 So. 2d 1276 (Ala. Crim. App., 1996), aff'd, 710 So. 2d 1350 (Ala. 1997), cert. denied, 524 U.S. 929, 118 S. Ct. 2325, 141 L. Ed. 2d 699 (1998). Although the trial court is required to consider all mitigating circumstances, the decision whether a particular mitigating circumstance is proven and the weight to be given it rests with the sentencer. *Carroll v. State*, 599 So. 2d 1253 (Ala. Cr. App. 1992), aff'd, 627 So. 2d 874 (1993), cert. denied, 510 U.S. 1171, 114 S. Ct. 1207, 127 L. Ed. 2d 554 (1994). *See also Ex parte Harrell*, 470 So. 2d 1309 (Ala.), cert. denied, 474 U.S. 935, 106 S. Ct. 269, 88 L. Ed. 2d 276 (1985). Moreover, the trial court is not required to specify in its sentencing order each item of proposed nonstatutory mitigating evidence that it considered and found not to be mitigating. *Morrison v. State*, 500 So. 2d 36 (Ala. Cr. App. 1985), aff'd, 500 So. 2d 57 (Ala.

114

1986), cert. denied, 481 U.S. 1007, 107 S. Ct. 1634, 95 L. Ed. 2d 207 (1987); *Williams v. State.*

We conclude, contrary to Ingram's contentions, that the trial court considered all evidence offered by Ingram in mitigation and did not restrict him in any manner in his presentation of mitigating evidence. The record clearly supports this conclusion. As to nonstatutory mitigating circumstances, the trial court found:

> "The Court has made a diligent search under the provisions of Section 13A–5–52, the evidence offered by [Ingram], and aspects of the presentence report favorable to [Ingram] on mitigation to determine if there is any aspect of [Ingram's] character or record or any circumstances of the offense for which he has been convicted that would constitute a mitigating circumstance and finds that there is one mitigating circumstance as set out above [the statutory mitigating circumstance that [Ingram] had no significant history of prior criminal activity], but finds no other statutory or nonstatutory [mitigating circumstance?]"

(C.R.55.)

The trial court in its sentencing order specifically referred to Ingram's evidence offered in mitigation, as follows:

> "[Ingram] offered evidence of mitigating circumstances as provided in Section 13A–5–52 from his family members, Dorothy Ackles, his mother, and other family members Kelvin Ingram, Felicia Stewart, Willie P. Taylor, Mary Jones, Anthony Parker, Joyce Elston and Glenda Parker."

(C.R.50.)

The trial court's sentencing order clearly shows that it considered all relevant statutory and nonstatutory mitigating evidence. Thus, we find no merit in Ingram's contention that the trial court failed

to consider his evidence of nonstatutory mitigating circumstances. Although the trial court is required to consider all mitigating circumstances, and in this case it obviously did, the decision whether a particular mitigating circumstance is proven and the weight to be given it rests with the trial court. The fact that the trial court did not list and make findings in its sentencing order as to the alleged nonstatutory mitigating circumstances offered by Ingram indicates only that it found some evidence not to be mitigating, not that the evidence was not considered. After reviewing the evidence presented in mitigation and the findings of the trial court in reference to it, we conclude that the findings are amply supported by the record, and that no error was committed by the trial court in reference to them. Ingram's contentions concerning the trial court's findings and consideration in reference to the mitigating circumstances certainly do not rise to the level of plain error.

*Ingram*, 779 So. 2d at 1246-47.

Because the ACCA decided this claim on the merits, pursuant to 28 U.S.C. § 2254(d)(1)-(2), Ingram's task is to establish not only that this claim is meritorious but also that the ACCA's rejection of the claim[16] was either an unreasonable determination of the facts in light of the evidence presented in the state court proceeding or was contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent. Ingram contends that the trial court's alleged

---

[16]     Ingram raised this claim in his petition for certiorari to the Alabama Supreme Court, but that Court affirmed the ACCA's judgment without specific discussion of this claim. *See Ex parte Ingram*, 779 So. 2d at 1285. Because the Alabama Supreme Court affirmed the ACCA's judgment without discussion of this claim, the Court looks to the ACCA's analysis. *See Wilson*, 138 S. Ct. at 1192, *supra*, note 7.

refusal to consider this mitigating evidence was contrary to *Eddings*, and the ACCA's conclusion that the trial court did so is an unreasonable determination of the facts.

In *Raulerson v. Wainwright*, the Eleventh Circuit rejected the same argument that Ingram makes here—that the sentencing court failed to consider as a nonstatutory mitigation circumstance the host of witnesses who testified to the petitioner's troubled childhood, excellent work record, devotion to family, and other positive attributes. The court's analysis squarely forecloses Ingram's argument here and is therefore repeated as follows:

> This requirement of giving full consideration to mitigating factors in addition to the nature and circumstances of the crime was given increased vitality in *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978). In *Lockett*, the Supreme Court struck down the Ohio death penalty statute because it failed to allow consideration of such factors as age and familial history in mitigation. Under the Ohio statute, personal background evidence was admissible only if it substantiated the existence of any of the state's three statutorily enumerated mitigating circumstances. The Supreme Court invalidated the statute as violative of the eighth and fourteenth amendments, holding that the sentencer must "not be precluded from considering . . . any aspect of a defendant's character or record" proffered in mitigation of his offense. *Id.* at 604, 98 S. Ct. at 2964–65, 57 L. Ed. 2d at 990. Thus, *Lockett* instructs that the sentencing body be free to consider the impact of the defendant's background in making its decision. To say, however, as Raulerson maintains, that *Lockett* imposes a duty on the sentencer to regard such evidence as mitigating is quite another matter. That such an interpretation would be an overbroad reading of *Lockett* is apparent from the Supreme Court's subsequent decision in *Eddings v. Oklahoma*, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982).

In *Eddings*, the Supreme Court overturned a death penalty because the trial court refused to consider Eddings' troubled past in mitigation of his sentence. In reaching its decision, the Court concluded that it was "clear that the trial judge did not evaluate the evidence in mitigation and find it wanting as a matter of fact, rather he found that as a matter of law he was unable even to consider the evidence." *Id.* at 113, 102 S. Ct. at 875, 71 L. Ed. 2d at 10 (emphasis original). The trial judge's self-imposed restrictions on the scope of the evidence that he would consider in mitigation violated both state statutory law and federal judicial precedent. As the Court stated, "the Oklahoma death penalty statute permits the defendant to present evidence 'as to any mitigating circumstances.' *Lockett* requires the sentencer to listen." *Id.* at 115, n. 10, 102 S. Ct. at 876 n. 10, 71 L. Ed. 2d at 11 n. 10 (emphasis added) (citation omitted).

A careful examination of *Eddings* reveals that the Constitution prescribes only that the sentencer hear and consider all the evidence a defendant chooses to offer in mitigation. There is no requirement that the court agree with the defendant's view that it is mitigating, only that the proffer be given consideration. FN 3

> FN 3 Our conclusion on this point is reinforced by this circuit's recent decision in *Dobbert v. Strickland*, 718 F.2d 1518 (11th Cir. 1983). There the court faced a similar challenge that the district court had failed both to consider non-statutory evidence and to find it mitigating. In rejecting this argument, the court stated:
>
>> The fact that the sentencing order does not refer to the specific types of non-statutory "mitigating" evidence petitioner introduced indicates only the trial court's finding the evidence was not mitigating, not that such evidence was not considered. Whether particular evidence, such as the fact that Dobbert had a difficult childhood, is mitigating depends on the evidence in the case as a whole and the views of the

sentencing and reviewing judges. What one person may view as mitigating, another may not. Merely because the Florida courts, operating through a properly drawn statute with appropriate standards to guide discretion, do not share petitioner's view of the evidence reveals no constitutional infirmity.

*Id.* at 1524. Therefore, as long as the proffered evidence is considered fairly, the Supreme Court's mandate in *Eddings* generally is satisfied. . . .

The reliance on mitigating evidence is a matter for the sentencing authority. Although the Supreme Court has indicated that in certain circumstances, background evidence not only must be considered but must be accorded significant weight, the general rule is that as long as the evidence is evaluated, it properly may be given little weight or no weight at all. *See Eddings v. Oklahoma*, 455 U.S. at 114–15, 102 S. Ct. at 875–76, 71 L. Ed. 2d at 11.

In this case, the trial court explicitly demonstrated that it had met its constitutional burden. It heard extensive evidence in mitigation and then made an explicit finding: "The Court has examined and considered the evidence to determine whether there are circumstances, other than those specified [in the Florida statute], which would mitigate the murder committed by the Defendant herein. The Court finds that there are no such non-statutory mitigating circumstances within the meaning of *Lockett v. Ohio*. . . ." There can be no clearer evidence that the trial court followed *Lockett*'s dictates.

In summary, *Lockett* stands for the proposition that the sentencer must *consider* all mitigating evidence. After so doing, it then is generally free to accord that evidence such weight in mitigation that it deems fit.

732 F.2d 803, 807–08 (11th Cir. 1984) (some footnotes omitted).

While Ingram argues that the trial court's recitation in the sentencing order of the witnesses that testified for him cannot be taken as an indication that the trial court engaged in the weighing and consideration of such evidence, his argument is simply foreclosed by existing precedent holding to the contrary. As such, Ingram has failed to prove that the ACCA decision meets the exceptions in § 2254(d) and is thus not owed deference.

**K.    Ingram's claim that he was denied due process of law in the state post-conviction court when the circuit court refused to grant him funds for a mental health expert and also refused to allow him to put on mental health evidence without subjecting himself to examination from the State's expert**

In section IV.E.2., *supra*, the Court discussed Ingram's claim that his trial defense counsel were constitutionally ineffective during the penalty phase of his trial for failing to investigate and present mitigating evidence concerning the possibility that Ingram suffered neurological and psychiatric impairments due to possible exposure to lead and PCBs during his childhood. As this Court noted in that section, the Rule 32 court ruled that Ingram's refusal to subject himself to examination by the State's mental health expert operated as a waiver of the claim. In *this* claim, Ingram asserts that that ruling violated his due process rights.

In support of this claim, Ingram recounts the following. He was denied State funds for experts on his ineffective assistance of counsel claim by the Rule 32 court.

Despite the inability to pay an expert, he obtained two experts for this claim who were willing to work *pro bono*. Ingram listed those two individuals as experts at the evidentiary hearing. The State moved to order Ingram to make himself available for a psychological examination in order to rebut any evidence he intended to present. Ingram, on advice of counsel, refused to cooperate. On the morning of the hearing, the State argued that Ingram should not be allowed to present any evidence on his ineffective assistance of counsel claim concerning PCBs unless he would be willing at that time to submit himself to a psychological examination with the State's doctor. Ingram again refused. The trial court, based on this refusal, did not allow Ingram to introduce any evidence concerning his potential exposure to PCBs when he was growing up in Anniston.

This is not the first time that Ingram has argued that his due process rights were violated when he was refused funds for experts to develop and prove his claims on post-conviction relief. He sought a writ of mandamus from the ACCA and then the Alabama Supreme Court after the Rule 32 court refused to allow his proposed experts to testify unless he submitted to a psychological evaluation, and those requests were denied. The ACCA's denial order explained as follows:

> Ingram argues that because the circuit court denied his motion for funds to secure a mental health expert for the postconviction proceedings, the circuit court erred in granting the State's motion. Ingram also asserts that according to Rule 35, Ala. R. Civ. P., the circuit

court could not order a mental evaluation of a party unless there is good cause. Ingram further asserts that the circuit court's ruling is without any basis in law.

When granting the State's motion for access to Ingram, Judge Howell stated; "The Court sees no danger in access to the Petitioner by the State, since he could be called to testify in this matter under the Alabama Rules of Criminal Procedure, Rule 32 of the State of Alabama."

The postconviction proceeding filed in the circuit court was initiated by Ingram. "Postconviction relief is even further removed from the criminal trial than is discretionary direct review. It is not part of the criminal proceeding itself, and it is in fact considered to be civil in nature. . . . It is a collateral attack that normally occurs only after the defendant has failed to secure relief through direct review of his conviction." *Pennsylvania v. Finley*[,] 481 U.S. 551, 556-57 (1987). In Alabama, Rule 32.4, Ala. R. Crim. P., specifically provides that: "Proceedings under this rule shall be governed by the Rules of Criminal Procedure." Though, civil in nature Alabama postconviction proceedings are not governed by the Alabama Rules of Civil Procedure. *See Washington v. State*. 95 So. 3d 26 (Ala. Crim. App. 2012). Also, Rule 32.9(b), Ala. R. Crim. P., specifically provides: "The petitioner may be called to testify at the hearing by the court or by either party." In *State v. Click*, 768 So. 2d 417 (Ala. Crim. App. 1999), this Court held that the Fifth Amendment right to self-incrimination did not apply to postconviction proceedings. We further held that when a petitioner filed a postconviction petition alleging various claims of ineffective assistance of counsel the petitioner '"waive[d] the attorney-client privilege as to matters reasonably related to the claim of inadequate representation.'" 768 So. 2d at 421.

. . .

Here, Ingram raised numerous claims of ineffective assistance of counsel related to counsel's failure to investigate and present a multitude of mitigation evidence at Ingram's sentencing hearing. As we noted in *Click*, the State would be placed in an "untenable position" if

it could not defend against a postconviction petitioner's claims. 768 So. 2d at 421. Given the nature of postconviction proceedings and the allegations that Ingram has made against his trial counsel, we cannot say that Judge Howell abused his considerable discretion in granting the State's motion for access to Ingram. Ingram has failed to meet his heavy burden of establishing the requirements for the issuance of a writ of mandamus.

(Vol. 43, Tab #R-112, at 2.)

Additionally, on appeal to the ACCA from the Rule 32 court's denial of his fifth amended Rule 32 petition, Ingram argued that the circuit court's decision to deny him funds for expert assistance was questionable. The ACCA affirmed the Rule 32 court, on (1) the initial ruling denying the motion for expert funding, (2) the ruling on the State's motion for a psychological examination (*see* portion of the ACCA's opinion reproduced in part IV.E.2. of this opinion, *supra*) and (3) the ineffective assistance of counsel claim itself (*see id.*). With regard to the court's refusal to provide State funds to Ingram to hire experts, the ACCA held as follows:

Ingram argues that the circuit court erred in denying his allegations that trial counsel were ineffective for failing to investigate and to present evidence of neurological impairments as a result of Ingram's alleged exposure to lead and PCBs. The circuit court found these allegations to be speculative. Ingram, though, argues that this decision was erroneous in light of the circuit court's denying him funds for expert assistance to develop, to plead, and to prove these allegations.

Ingram sought in the circuit court $4,000 to retain a mental-health expert who specializes in neuropsychological assessments; $5,000 to retain a forensic psychologist or psychiatrist; and $3,500 to retain Pamela Blume Leonard, a social worker with expertise in social

history investigations in capital cases. (Mandamus, Attachment 7.) Ingram's motion asserted that he had been exposed as a child to lead and other heavy metals, as well as PCBs, and that he could not fully develop additional facts and testimony without funds for expert assistance. The circuit court denied Ingram's motion without explanation.

. . . Ingram argues that the circuit court's decision to deny him funds for expert assistance was questionable. Although Ingram concedes that the circuit court's decision denying him funds for expert assistance comports with the "most natural reading" of *James v. State*, 61 So. 3d 357 (Ala. Crim. App. 2010), Ingram argues that the circuit court's denial is "out of step with Supreme Court jurisprudence," which seeks to ensure "that full factual development of a claim takes place in state court channels." (Ingram's brief, at 51; citing *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992)).

In *James*, this Court stated:

"'Because the law is clear that Rule 32 petitioners are not entitled to funds to hire experts to assist in postconviction litigation, ex parte or otherwise, the trial court did not err in denying the motion. *Boyd v. State*, 913 So. 2d 1113 (Ala. Crim. App. 2003).' *Johnson v. State*, [Ms. CR–05–1805, Sept. 28, 2007] ____ So. 3d ____, ____ (Ala. Crim. App. 2007), [vacated on other grounds by *Johnson v. Alabama*, 137 S. Ct. 2292 (2017)]. *See also Bush v. State*, [92 So. 3d 121] (Ala. Crim. App. 2009); *Burgess v. State*, 962 So. 2d 272 (Ala. Crim. App. 2005); *Boyd v. State*, 913 So. 2d 1113 (Ala. Crim. App. 2003); *Williams v. State*, 783 So. 2d 108 (Ala. Crim. App. 2000); *Ford v. State*, 630 So. 2d 111 (Ala. Crim. App. 1991); *Hubbard v. State*, 584 So. 2d 895 (Ala. Crim. App. 1991).

"'Contrary to McGahee's assertions, the trial court was not obliged to allow him to proceed ex parte in his request for funds to pursue his postconviction claims.

McGahee's reliance on *Ake v. Oklahoma*[, 470 U.S. 68, 105 S. Ct. 1087, (1985)] is misplaced because postconviction proceedings pursuant to Rule 32, Ala. R. Crim. P., are not criminal in nature. McGahee, himself, pursued this discretionary legal action against the State of Alabama, and the action is civil in nature. *See Hamm v. State*, 913 So. 2d 460, 471 (Ala. Crim. App. 2002), and cases cited therein. This Court held that the fundamental fairness mandated by the Due Process Clause does not require the trial court to approve funds for experts at a postconviction proceeding. *Hubbard v. State*, 584 So. 2d 895, 900 (Ala. Crim. App. 1991). Moreover, this Court has specifically held that *Ake* is not applicable in postconviction proceedings. *Ford v. State*, 630 So. 2d 111, 112 (Ala. Crim. App. 1991), aff'd, 630 So. 2d 113 (Ala. 1993). *See also Williams v. State*, 783 So. 2d 108 (Ala. Crim. App. 2000), aff'd, 662 So. 2d 929 (Ala. 1992) (table).

"'McGahee's reliance on *Ex parte Moody*, 684 So. 2d 114 (Ala. 1996), is misplaced. In *Moody*, the Alabama Supreme Court held that "an indigent criminal defendant is entitled to an ex parte hearing on whether expert assistance is necessary, based on the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution." 684 So. 2d at 120. As discussed above, for purposes of this proceeding, McGahee is not "an indigent criminal defendant." Instead, he is a convicted capital murderer who, in Rule 32 proceedings, is a civil petitioner with the burden of proving that he is entitled to relief

> on the grounds alleged in the petition he filed. *Moody* does not support McGahee's argument here. McGahee is not entitled to any relief on this claim of error. The trial court did not err when it denied an ex parte hearing on McGahee's request for funds.'

> "*McGahee v. State*, 885 So. 2d 191, 229 (Ala. Crim. App. 2003)."

*James*, 61 So. 3d at 383. *See also White v. State*, [Ms. CR, April 12, 2019] ____ So. 3d ____, ____ (Ala. Crim. App. 2019) ("'Since a post-conviction petitioner does not have a constitutional right to appointed counsel . . . there is no constitutional obligation to provide post-conviction counsel with investigative resources . . . Where no constitutional right is implicated, the decision to appoint an expert, or to authorize funds to hire an expert, rests within the sound discretion of the circuit court.'" (quoting *People v. Richardson*, 189 Ill. 2d 401, 422, 245 Ill. Dec. 109, 727 N.E.2d 362, 375 (2000))).

> The cases on which Ingram relies involve federal habeas proceedings and do not apply to state postconviction proceedings. The circuit court committed no error in denying Ingram's motions for funds for experts to assist in the postconviction proceedings.

(Vol. 41, Tab #R-107, at 32-34.)

Respondent contends that Ingram cannot raise this claim in federal habeas corpus proceedings because it concerns only "defects in the state post-conviction proceedings." The Court agrees. Federal habeas corpus relief does not lie for errors of state law, including the allegedly erroneous admission of evidence under state evidentiary rules. *Estelle v. McGuire*, 502 U. S. 62, 67 (1991). It is not the province of a federal habeas court to reexamine state-court determinations on state-law

questions. *Id*. at 67-68. State court rulings on matters such as the admissibility of evidence under state evidentiary rules and the interpretation of substantive state case law bind a federal court in habeas corpus proceedings. *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *Loggins v. Thomas*, 654 F.3d 1204, 1228 (11th Cir. 2011) ("Alabama law is what the Alabama courts hold that it is.").

Ingram acknowledges that a federal court reviewing a state prisoner's habeas petition may not reexamine state-court determinations on state-law questions, but he argues that the federal court may nonetheless "review state evidentiary rulings to determine whether the rulings violated the petitioner's due process rights." (Doc. 43 at 18 n.56 (quoting *Smith v. Jarriel*, 429 F. App'x 936, 937 (11th Cir. 2011) (citing *Felker v. Turpin*, 83 F.3d 1303, 1311-12 (11th Cir. 1996)).) This is true, but in the Eleventh Circuit cases Ingram relies upon, the state evidentiary rulings were made during the petitioners' criminal trials, not during their state collateral-review proceedings. *See Smith*, 429 F. App'x at 936 (reviewing evidentiary errors in the admission of photographs of the victim's dead body during trial); *Felker*, 83 F.3d at 1311-12 (reviewing the introduction of certain testimony at trial).

Defects in state collateral proceedings simply do not provide a basis for federal habeas relief. *See Alston*, 610 F.3d at 1325-26 (federal habeas relief is available to remedy defects in a defendant's conviction and sentence but not alleged defects in a collateral proceeding because a challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment), cert. denied, 562 U.S. 1113 (2010); *Carroll v. Sec'y, Dep't of Corr.*, 574 F.3d 1354, 1365 (11th Cir. 2009) ("a challenge to a state collateral proceeding does not undermine the legality of the detention or imprisonment, i.e., the conviction itself—and thus habeas relief is not an appropriate remedy"), cert. denied, 558 U.S. 995 (2009); *Quince v. Crosby*, 360 F.3d 1259, 1261-62 (11th Cir. 2004) ("an alleged defect in a collateral proceeding does not state a basis for habeas relief"), cert. denied, 543 U.S. 960 (2004).

Here, Ingram's final claim does not attack the validity of the fact or length of his confinement. His challenge concerns a state matter because Alabama provides for post-conviction procedures through its state statutes. These collateral proceedings are a state-created right. Thus, both of the state courts' rulings that he challenges—(1) their refusal to provide him funds for experts to prove his claims, and (2) their determination that Ingram could not proceed with his claim related to PCB and lead exposure unless he submitted to a psychological examination—concern only the state's application of its own post-conviction procedures, not the

legality of Ingram's detention for his capital murder conviction. As the ACCA noted above, at the point when Ingram claims he was denied due process of law, Ingram was not an indigent criminal defendant; rather, he was a civil litigant pursuing a claim against the State of Alabama pursuant to a state-created system to collaterally attack convictions.

Nonetheless, Ingram still claims that this Court could review his due process claim *de novo* because Alabama's post-conviction procedures do not provide the appropriate level of process to litigants and are thus not entitled to any deference, *see* part III.A. of this opinion, *supra*. However, as he did before the ACCA on appeal from the denial of his Rule 32 petition, he relies upon quotes from Supreme Court decisions taken out of context: (1) "[E]nsuring that full factual development of a claim takes place in state court channels the resolution of the claim to the most appropriate forum," *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 9 (1992); and (2) "[P]risoner[s are] in no position to develop the evidentiary basis for a claim of ineffective assistance, which often turns on evidence outside the trial record," *Martinez v. Ryan*, 566 U.S. 1, 11-12 (2012). Ingram stretches these cases too far, as neither case holds that a federal habeas petitioner may obtain relief in a 28 U.S.C. § 2254 proceeding on a purely state-law evidentiary ruling made during state post-conviction proceedings merely by couching it as a constitutional due process

violation. Accordingly, Ingram's challenge to the state post-conviction proceedings does not provide a basis for federal habeas relief.

## V.    CONCLUSION

For all of the reasons set forth herein, Ingram's petition for writ of habeas corpus is due to be dismissed, or in the alternative denied.

Rule 11(a) of the Rules Governing Section 2254 Cases requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. This Court may issue a certificate of appealability "only if the applicant has a made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurist would find the district court's assessment of the constitutional claims debatable and wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations omitted). This Court finds Ingram's claims do not satisfy either standard. Accordingly, a motion for a certificate of appealability is due to be denied.

A separate order in accordance with this opinion will be issued.

**DONE** and **ORDERED** on March 31, 2021.

_____
L. Scott Coogler
United States District Judge

160704